363 F.2d 43
 BUONO SALES, INC., a corporation of the State of New Jersey, Appellant,
v.
CHRYSLER MOTORS CORPORATION, a corporation of the State of
Delaware and Chrysler Corporation, a corporation
of the State of Delaware.
 No. 15523.
 United States Court of Appeals Third Circuit.
 Argued Feb. 7, 1966, Reargued June 10, 1966.
Decided July 14, 1966.
 
 Samuel Carotenuto, Red Bank, N.J., (Reussille, Cornwell, Mausner, Carotenuto & McGann, Red Bank, N.J., on the brief), for appellant.
 Frank C. O'Brien, Newark, N.J., (Pitney, Hardin & Kipp, Newark, N.J., on the brief), for appellees.
 OPINION
 Before STALEY, Chief Judge, and McLAUGHLIN, KALODNER, HASTIE, FORMAN, GANEY, SMITH and FREEDMAN, Circuit Judges.
 McLAUGHLIN, Circuit Judge.
 
 
 1
 This is one of nine suits by New Jersey DeSoto passenger automobile direct dealers for Chrysler Motors Corporation, a corporation of the State of Delaware with its principal place of business in Michigan, against said Chrysler Motors Corporation and Chrysler Corporation, also a corporation of the State of Delaware with its principal place of business in Michigan. The said nine plaintiffs are all New Jersey corporations with their principal offices in said state. It was agreed in the case that the separate entities of the defendant corporations be disregarded and that the acts of both be deemed the acts of Chrysler Corporation. This resulted in the dropping of the second, third and fifth causes of action. The parties also stipulated in the district court and on this appeal that, because all nine cases are similar in law and fact, the determination in the present appeal will apply to the other eight appeals. The district judge, sitting without a jury, decided in favor of the defendants and plaintiff appeals.
 
 
 2
 Plaintiff has been selling Chrysler products since approximately 1935. Since 1953 it has had a direct dealer agreement with Chrysler with respect to DeSoto and Plymouth passenger automobiles. On or about November 18, 1960 Chrysler discontinued its production of DeSoto passenger automobiles. In its notification to plaintiff of that course it made no pretension that it was acting in accordance with the agreement. A reading of the contract readily reveals the reason for this. It is completely a self-serving Chrysler product. It was drawn by Chrysler and on several occasions revised by that concern. It is what was the admittedly uniform Chrysler, DeSoto-Plymouth agency contract used by Chrysler with its over sixteen hundred such dealers. It takes elaborate precaution to protect Chrysler in the event of any contemplated exigency. It is very clear from the contract itself that the thought that sometime in the future Chrysler might abandon the manufacture of DeSoto passenger automobiles was plainly not within Chrysler's thinking when it entered into its dealer agreements with Buono and the others. Had it been intended that the contract include Chrysler's right to close out its DeSoto business if and when it chose to do so, nothing could have been easier than to say so. It is beyond belief that Chrysler endeavored to provide for that contingency by subterfuge. Chrysler was unquestionably the dominating party to the agreement with the dealers taking whatever arrangement Chrysler chose to give them. Deceiving its dealers from the beginning as to what would have been an all important element of the agreement, hardly fits that situation or indeed into the basic picture of an outstanding American industry. As appears from the record this matter arises wholly from a radical corporate determination, for whatever the reason, to cut its production losses on DeSoto immediately. The inevitable collateral consequences of that move, the damage claims of its dealers, etc., if then bothered about at all, undoubtedly were regarded as the lesser evil which could be handled later.
 
 
 3
 The defense has done all that could be accomplished in meticulously dredging out of the contract every stray bit of language that can possibly lend some support to the hastily assumed, unwarranted position of the defendant. Taken as a whole, which is the way the contract admittedly must be construed, or even isolating fragments of it as is attempted, there is not one word in the document to suggest that the manufacturer reserved the right to stop making DeSoto automobiles for any reason or no reason. The intention of the parties is set out succinctly in the first introductory paragraph which reads:
 
 
 4
 'The purpose of the relationship established by this agreement is to provide a means for the sale and service of De Soto and Plymouth passenger cars and De Soto and Plymouth car parts and accessories in a manner that will best serve the interests of the retail customer and be of benefit to DIRECT DEALER and DE SOTOPLYMOUTH.'
 
 
 5
 The same purpose is stated in Paragraph 5 which makes the agreement '* * * the entire agreement between the parties relating to the purchase by DIRECT DEALER of new De Soto and Plymouth passenger cars and De Soto and Plymouth passenger car parts and accessories from DE SOTO-PLYMOUTH for resale, and it cancels and supersedes all earlier agreements, written or oral, between DE SOTO-PLYMOUTH or Chrysler Corporation and DIRECT DEALER relating to the purchase by DIRECT DEALER of De Soto and Plymouth passenger cars and De Soto and Plymouth passenger car parts and accessories.'
 
 
 6
 The last subparagraph of Paragraph 5 categorically notes that 'this agreement does not have an ecpiration date.' Chrysler is therefore given the right to amend the agreement as it 'deems advisable', 'provided that DeSoto-Plymouth makes the same amendment in DeSoto-Plymouth Direct Dealer Agreements generally. The amendment will be set out in a notice signed by the President or Vice-President of Chrysler Motors Corporation. Thirty-five (35) days after delivery of the Notice to the Direct Dealer this agreement will be deemed to be amended in the manner and to the extent set forth in the notice.' No attempt was ever made to amend the notice by following the procedure called for by Paragraph 5 or otherwise.
 
 
 7
 Paragraph 5 also makes it an agreement term that 'DeSoto-Plymouth may terminate it individually only as provided for in Paragraph 21.' The latter, regarding this, reads:
 
 
 8
 'DE SOTO-PLYMOUTH may terminate this agreement on not less than ninety (90) days' written notice on (1) the failure of DIRECT DEALER to perform fully any of DIRECT DEALER'S undertakings and obligations in Paragraphs 7 through 10 and Paragraph 14 of this agreement, or (2) the death of any person listed in Paragraph 2 of this agreement, other than the death of DIRECT DEALER if he is an individual, or the failure of any such person so listed to continue his active and substantial participation in the management of DIRECT DEALER'S organization, or (3) a misrepresentation of or change in any of the ownership interests listed in Paragraph 3 of this agreement resulting in a transfer of majority control or interest in the capital stock or partnership interest of DIRECT DEALER, unless DE SOTO-PLYMOUTH has given written approval to such change, or (4), a disagreement, dispute or controversy between or among principals, partners, managers, officers or stockholders of DIRECT DEALER that, in the opinion of DE SOTO-PLYMOUTH, may affect adversely the operation, management or business of DIRECT DEALER, or (5) the conviction of DIRECT DEALER, or a partner, principal stockholder, officer or manager of DIRECT DEALER of any crime that, in DE SOTO-PLYMOUTH'S opinion, may affect adversely the operation or business of DIRECT DEALER or the name, good will, or reputation of DE SOTO-PLYMOUTH, De Soto or Plymouth products or DIRECT DEALER.'
 
 
 9
 None of the listed situations, because of which DeSoto-Plymouth could terminate its contract with the nine plaintiff dealers, ever occurred and there is no claim to the contrary. Despite makeweight quibbling on behalf of the appellee again there is an utter absence of any mysterious or ambiguous wordage respecting Chrysler's right to end the agreement. Actions or conduct, slight or grievous, on the part of the dealer to which Chrysler took exception gave the latter the right to terminate. Confessedly none of the dealers was or could be so charged.
 
 
 10
 Continuing the futile search to find a valid pretext for Chrysler we are told that Paragraph 10 takes care of this. The part of a sentence relied on is '* * * nor will anything in this agreement obligate DE SOTO-PLYMOUTH to deliver to DIRECT DEALER any particular number of new De Soto or Plymouth passenger cars.' This it is contended 'insulates appellee from liability for discontinuance of DeSoto production whether appellee's action is characterized either as contract modification or contract termination, depending upon the dealer affected.' And in the same paragraph it is further urged that the phrase 'De Soto-Plymouth will not be liable for delay or non delivery of products ordered * * *' exonerated the manufacturer from liability to the dealers 'even in the absence of the rights of discontinuance and amendment' and '* * * regardless of the existence of good faith or other contractual rights.' The proposition is put forth as supported by F. H. McClintock Co. v. Truxell Sales & Service, 297 Mich. 284, 297 N.W. 493 (1941). That decision, for whatever it may be worth, has no application to the admitted facts before us.
 
 
 11
 The dispositive answer to the above assertion that Paragraph 10 gives DeSoto-Plymouth the right to permanently stop DeSoto production is found right in Paragraph 10 and in the identical sentence from which the above quotations were taken out of context. Paragraph 10 is captioned 'Orders'. It provides the method by which the dealer orders the cars and for the strong control granted Chrysler over its deliveries. The paragraph reads:
 
 
 12
 'DE SOTO-PLYMOUTH agrees to ship De Soto and Plymouth passenger cars and De Soto and Plymouth passenger car parts and accessories to DIRECT DEALER only on DIRECT DEALER'S order.
 
 
 13
 'DIRECT DEALER agrees to submit to DE SOTO-PLYMOUTH current orders for De Soto and Plymouth passenger cars and De Soto and Plymouth passenger car parts and accessories, and estimates of DIRECT DEALER'S future passenger car requirements at such times and for such periods as DE SOTO-PLYMOUTH reasonably may request for the mutual benefit of dealers and DE SOTO-PLYMOUTH. DIRECT DEALER will submit such orders and estimates on forms DE SOTO-PLYMOUTH provides. All orders are subject to acceptance by DE SOTO-PLYMOUTH, which may be in whole or in part. DE SOTO-PLYMOUTH will use its best efforts to fill accepted orders for De Soto and Plymouth passenger cars and De Soto and Plymouth passenger car parts and accessories; however, DE SOTO-PLYMOUTH will not be liable for delay or nondelivery of products ordered nor will anything in this agreement obligate DE SOTO-PLYMOUTH to deliver to DIRECT DEALER any particular number of new De Soto or Plymouth passenger cars.'
 
 
 14
 It is an understatement to say that Paragraph 10 simply outlines the running order and delivery part of the DeSoto-Plymouth dealer relationship. It is pretty much under the domination of the manufacturer with respect to the number of cars it allots a dealer but Paragraph 10 cannot be tricked up into presenting any right to Chrysler to end its making of DeSoto passenger cars. It contains the rules for a functioning business and though strongly hedged around nevertheless DeSoto-Plymouth pledges as part of the continuing association with its dealer that it '* * * will use its best efforts to fill accepted orders for De Soto and Plymouth passenger cars and DeSoto and Plymouth accessories; * * *.' Appellee is expressly and properly reluctant to resort to this argument which possesses no merit whatsoever.
 
 
 15
 Paragraph 28 of the agreement is mentioned as another ground for Chrysler ending the DeSoto passenger car. That is titled 'Inability to Perform'. It reads:
 
 
 16
 'In addition to any other exemption from liability specifically provided for in this agreement, neither DIRECT DEALER nor DE SOTO-PLYMOUTH will be liable for failure to perform its part of this agreement when the failure is due to fire, flood, strikes or other labor disputes, accident, war, riot, insurrection, acts of government, governmental regulation or other circumstances beyond the control of the parties.'
 
 
 17
 This time the clause '* * * other circumstances beyond the control of the parties' is removed from the paragraph and is construed to mean that if Chrysler for business circumstances as it claims or any other circumstances thoroughly foreign to the title, text and purport of 28 decides to finish with its manufacture of DeSotos it may do so. The catch-all language relied upon is limited to the kind of events specifically named. It will not serve as a convenient umbrella to cover the entirely unrelated good or bad business conditions and practice alleged. This contract by its terms is to be under Michigan law. The latter follows the general rule mentioned. Hamilton v. Stephans, 240 Mich. 228, 215 N.W. 321 (1927); Quisle v. Brezner, 212 Mich. 254, 180 N.W. 467 (1920); Park Building Co. v. George P. Yost Fur Co., 208 Mich. 349, 175 N.W. 431 (1919).
 
 
 18
 Finally there is Paragraph 20 upon which the district court principally depended in deciding in favor of the defendant. The title of 20 and its text reads:
 
 
 19
 '20.
 
 
 20
 CHANGE OF MODELS, PARTS AND ACCESSORIES DECLARED OBSOLETE OR DISCONTINUED
 
 
 21
 'DE SOTO-PLYMOUTH at any time may discontinue any models, lines or body styles and may revise, change or modify their construction or classification. All orders will refer to models, lines and body styles in production at the time DE SOTO-PLYMOUTH receives the orders unless DIRECT DEALER specifies otherwise. DE SOTO-PLYMOUTH at any time may declare obsolete or discontinue any or all parts, accessories and other merchandise. DE SOTO-PLYMOUTH may act under this Paragraph 20 without notice and, except as set forth in Paragraph 13 of this agreement, without any obligation to DIRECT DEALER by reason of DIRECT DEALER'S previous purchases.'
 
 
 22
 The defense view is that the words in the text 'models', 'lines', 'body styles' individually or together mean the DeSoto emphasized with respect to the emphasized with reapect to the word 'lines'. The title of 20, its opening sentence and every word of the balance of the paragraph are the strongest possible refutation of this far fetched assumption. In the district court it was finally accepted that 'model' meant year of make and that 'body style' referred to a particular kind of automobile as a two-door or a four-door, hardtop or convertible. The defense seemingly on the theory that the word 'line' needed testimony to clarify it called the president of Chrysler Corporation as a witness. He gave evidence as follows:
 
 
 23
 Q. The fifteen page of this progress report of November 26 (1958), marked P-7 for identification, Mr. Quinn would you read the paragraph under 'De Soto,' one paragraph? A. The De Soto product plan is progressing within the framework outlined in the previous report, The names of the two model lines have been decided, Fireflite for the low line, Adventurer for the high line. The product planning letter has been issued, which details all the major specifications for the revised De Soto line. Q. And the Fireflight De Soto was considered the low line of the De Soto passenger car, isn't that so? A. Yes, sir. Q. And the Adventurer was considered the hegh line? A. Yes, sir. Q. But they were both considered lines within the De Soto passenger car framework? A. That's what the bulletin says.'
 
 
 24
 There was really no need of the above testimony. The contract is plenary proof that 'line' or 'lines' in that paper, as the Chrysler witness had to verify, merely designated a type or types of DeSoto passenger car or automobile. The latter designation is repeated thirty times in the agreement. It is the generic term for the Chrysler DeSoto automobile. The word 'line' or 'lines' does not appear in the agreement at all as meaning the DeSoto passenger automobile complex. It was precisily used to designate types of DeSoto cars and, in the same double agreement, types of Plymouth automobiles. The thought is advanced that the use of plurals in 'models, lines or body styles' is significant and shows that the words 'all 'lines' could be discontinued', in dffect allows discontinuance of all production of the DeSoto. It is beyond belief to countenance the final close out of the manufacture of the DeSoto automobile on that foundation. It must be recorded in passing that the above Paragraph 20 does not allow the discontinuance by DeSoto Plymouth of all models, lines and body styles. The paragraph actually says 'DeSoto Plymouth at any time may discontinue any models, lines and body styles * * *.' The paragraph goes on about its business of further stating other governing details of the manufacturer-dealer operation. There is not the slightest inference that it has to do with other than that and certainly nothing to convey the impression that under it Chrysler is granted the right of effective termination. It is perhaps fitting that the very next paragraph of the contract, number 21, which has already been discussed, is captioned 'Termination'.
 
 
 25
 It is noteworthy that the representation that in the critical period DeSoto sales fuffered an extremely serious decline due to the shift in consumer tastes from the middle priced car field to the lower priced and foreign car fields, according to the defense itself in the answer, is only 'one of the reasons given for the discontinuance of the DeSoto passenger automobile * * *.' Another reason stressed for discontinuance was that since 1957 there had been 'persistent reports of its discontinuance. These widely circulated reports had an adverse effect upon our mutual ability to merchandise this fine product in a successful manner.' No mention is made as to whether those reports had validity. And there is no allusion at all to whether there were any intrinsic management problems or whether there were vital management changes thereafter.
 
 
 26
 The contract under Paragraph 21 could be terminated by a direct dealer on 'not less than thirty (30) days' written notice.' It was Chrysler management who intentionally drew the agreement without an expiration date and gave to itself certain named rights for termination as set out above in Paragraph 21. It was expressly because of this that Chrysler in Paragraph 5 reserved to itself the right to amend the agreement as it 'deems advisable' by taking certain procedural steps. That portion of Paragraph
 
 
 27
 'Since this agreement does not have
 
 
 28
 'Sincethis agreement does not have an expiration date and DE SOTO-PLYMOUTH may terminate it individually only as provided in Paragraph 21, and since circumstances may exist that DE SOTO-PLYMOUTH believes require amending all De Soto-Plymoth Direct Dealer Agreements, DE SOTO-PLYMOUTH will have the right to amend this agreement to the extent that DE SOTO-PLYMOUTH deems advisable, provided that DE SOTO-PLYMOUTH makes the same amendment in De Soto-Plymouth Direct Dealer Agreements generally. The amendmant will be set out in a notice signed by the President or a VicePresident of Chrysler Motors Corporation. Thirty-five (35) days after delivery of the notice to DIRECT DEALER, this agreement will be deemed to be amended in the manner and to the extent set forth in the notice.'
 
 
 29
 The above eliminates any guessing as to what sort of contract is before us. The dealer could terminate it on not less than thirty days' notice. Chrysler could terminate it only for certain stated reasons concerning the dealer. Chrysler could also amend the agreement as it 'deems advisable' by simply following notice provisions of Paragraph 5. None of those eventualities occurred. We do not pass finally upon whether Chrysler under the 'deems advisable' grant could so amend the contract as to include its discontinuance of the manufacture of DeSoto passenger cars which would in effect terminate the agreement under the guise of amending it. There was no endeavor by Chrysler to bring its action within that clause either at the time of its discontinuance of DeSotos or since. However, there is some late argument to this court urging that the taking by the dealers of Chrysler's allowance to DeSoto dealers of a $300 credit on unsold cars is a waiver by the dealers of the contract involved here. That contention did not appear in the original answer or until the last pretrial conference. It certainly was not pressed to the district judge who correctly held that:
 
 
 30
 'It is plaintiff's contention in count one of its complaint that Chrysler's discontinuance of the DeSoto automobile constituted a breach of this Agreement. Chrysler, on the other hand, in addition to other reasons advanced to justify its action, takes the position that the Agreement, by its very terms, gave it the right to discontinue the DeSoto, without notice, and without any obligation to plaintiff. The problem thus boils down to one of interpretation and construction of the Agreement in question.'
 
 
 31
 The credit allowance which readily fits in, as appellant mentions, with the manufacturer's ordinary allowance to its dealers on unsold cars, was never the subject of any agreement, formal or otherwise, whereby the dealer accepts the rebates and waives its contract. There is no mention of that intention in Chrysler's telegram or letter of discontinuance. This is merely another example of the intensive defense exploration for something to bolster its position. It is entirely wirhout merit.
 
 
 32
 The contract before us is clear. Its unmistakable intent is to protect Chrysler as to its dealers in every foreseen contingency. It does not by its terms or impliedly give Chrysler the naked right to discontinue without contract cause, manufacturing and distributing to its dealers DeSoto automobiles. In so doing Chrysler broke the contract.
 
 Tortious Interference
 
 33
 Appellant, representative of the dealer plaintiff claims, also sues for tortious interference in its business by defendant.
 
 
 34
 The facts are not disputed. Following its discontinuance of the manufacture of the DeSoto automobile, defendant sent to all plaintiff's DeSoto owner customers literature telling of its discontinuance of the DeSoto and that, inter alia, 'He (your dependable Dodge dealer) is best qualified to give your DeSoto the genuine factory improved service it deserves.' This was excused by the district court as 'a lawful method of competition'; 'at most mere puffing'. The court held that 'Chrysler did not commit an act so unjustifiable or unreasonable as to constitute a tortious interference with plaintiff's business and economical advantage.' The court and the parties rightly agree that New Jersey law governs the issue in this instance. Under that law the defendant's carefully planned method of enticing plaintiff's DeSoto customers away from plaintiff and to defendant's active Dodge and Chrysler dealers was tortious interference with plaintiff's business. Louis Kamm, Inc. v. Flink, 113 N.J.L. 582, 175 A. 62, 99 A.L.R. 1 (Ct. E & A 1934); Sustick v. Slatina, 48 N.J.Super. 134, 137 A.2d 54 (App.Div.1957); Brenner & Co. v. Perl, 72 N.J.Super. 160, 178 A.2d 19 (App.Div.1962); Raymond v. Cregar, 72 N.J.Super. 73, 178 A.2d 29 (App.Div.1962) mod. 38 N.J. 472, 185 A.2d 856 (1962); Louis Schlesinger Co. v. Rice, 4 N.J. 169, 181, 72 A,2d 197 (1950).
 
 
 35
 The judgment of the district court will be reversed on both counts and the case remanded to that court for entry of judgment in favor of the plaintiff on both counts and for trial as to damages on both counts.
 
 
 36
 FORMAN, Circuit Judge (dissenting).
 
 
 37
 This appeal encompasses two distinct problems. The first issue raised is whether Chrysler's Direct Dealer Agreement permitted the termination of DeSoto automobile production and, if so, whether such production was terminated in accordance with the provisions of that Agreement. In determining that the Direct Dealer Agreement did not authorize Chrysler's termination of DeSoto production in the manner in which it acted, the majority places much emphasis on the absence of an explicit termination provision as indicating that Chrysler, the deafter of the Agreement, and Buono Sales, did not intend a discontinuance of DeSoto production. The majouity further concludes that the notice of termination embodied in the telegram and form letter of November 18, 1960 sent to all DeSoto direct dealers was insufficient to constitute such a modification under Paragraph 5.
 
 
 38
 The second issue raised is whether the representation of the Dodge Division of Chrysler in a brochure circulated to De Soto owners that it was 'best qualified to give (the discontinued DeSoto automobile) the genuine factory-approved service it deserves' was a tortious interference with the business relationships and prospective economic advantage of Buono Sales. The majority finds that such representation constituted a commercial tort.
 
 
 39
 We are constrained to dissent from these conclusions and the reversal of the judgment of the District Court.
 
 
 40
 * Certain preliminary observations are in order. It is self-evident tnat the presence of a provision in the Direct Dealer Agreement authorizing, in so many words, the termination of all De Soto production would have greatly simplified the problem of contract interpretation here. The absence of such a provision, however, is given undue emphasis. In our view a significant amount of fairly plain language in the Agreement has thereby been given a strained construction to support the position taken by Buono Sales.
 
 
 41
 The observation, that the Direct Dealer Agreement 'is completely a self-serving Chrysler product' which 'takes elaborate precaution to protect Chrysler in the event of any contemplated exigency' and that, therefore, the absence of an explicit termination provision is persuasive of no intent to eliminate DeSoto production, in the future, does not present a balanced view of the Agreement in the light of the mutuality of obligation inherent in the explicit authority given the direct dealers themselves to withdraw totally from the Agreement on 30 days written notice apparently for whatever reason.[1] Furthermore, under Paragraph 7, the direct dealers' minimum purchase requirements from Chrysler were directly geared to market conditions in the dealers' localities.[2] The intimation drawn from the characterization of the Agreement, as a self-serving document, that it must necessarily be construed against its drafter, is unwarranted, Invocation of such a rule of construction is furthermore not appropriate here, for it would not be reasonable considering both the existence of much plain language in support of Chrysler's petition and the background history of the industry.
 
 
 42
 We recognize that this courtS primary duty is to determine the meaning of the language of the contract but, in so soing, the commercial context in which both litigants conduct their respective business operations must be squared with the construction placed on the language of the Agreement. The record reflects the volatile nature of the automobile industry due to changes in consumer tastes and effects of competition. Buono Sales, itself, which had been franchised to deal in DeSoto automobiles since 1935, and had been and is now so franchised to deal in Plymouth automobiles had, prior to that time, experienced the discontinuance of the production of a number of automobiles in which it dealt. In the period 1955-60 DeSoto sales suffered an extremely serious decline[3] due to the shift in consumer tastes from the middle-priced automobile field, which included DeSoto, to the lower-priced and foreign car field. Significantly, in 1959, just prior to the discontinuance of DeSoto production, Buono Sales and other direct dealers became franchised by Chrysler to sell and maintain the compact automobile Valiant, then newly produced. Of course, in the absence of a contract which has language reasonably susceptible to construction consistent with the commercial history of the parties, such commercial background cannot be employed as persuasive on the issue of contract interpretation. But here, given the presence of what will be shown to be substantial expressions in the Direct Dealer Agreement authorizing the termination of DeSoto production without notice we cannot accept the majority's view of the meaning of the Agreement for it is alien to the business experience of both litigants as disclosed by the record.
 
 
 43
 -- II--
 
 
 44
 The central consideration is the determination of the meaning of certain language in the Direct Dealer Agreement. The District Court found Paragraph 20 to be determinative of the case. Paragraph 20 provides:
 
 
 45
 'DE SOTO-PLYMOUTH at any time may discontinue any models, lines or body styles and may revise, change or modify their construction or classification. * * * DE SOTO-PLYMOUTH at any time may declare obsolete or discontinue any or all parts, accessories, and other merchandise. DE SOTO-PLYMOUTH may act under this Paragraph 20 without notice and, except as set forth in Paragraph 13 of this agreement, without any obligation to DIRECT DEALER by reason of DIRECT DEALER'S previous purchases.'
 
 
 46
 Buono Sales's argument before the District Court and before us is that Paragraph 20, in effect, authorized discontinuance of any DeSoto automobiles short of discontinuance of all DeSoto automobiles. This position is founded on Buono Sales's definition of the term 'lines' which it contends refers to a series of DeSoto automobiles, i.e., the Adventurer series or the Fireflite series. This being so, argus Buono, only a series, e.g., Adventurer, if more than one series is produced, could be discontinued, but the total production of DeSoto automobiles could not be discontinued. The District Court went to the record where there was evidence to prove that the contracting parties understood 'line' to be synonymous with DeSoto, as well as with a series of DeSoto, such as Adventurer. The majority rejects the use of this extrinsic evidence on the grounds that the context of the contract without more demonstrates that 'line' was not meant to be synonymous with the DeSoto automobile. Assuming the impropriety of weighing the extrinsic evidence as to the meaning of 'line', and that the majority properly reads the contract language as to the meaning of 'line', this term was used in the plural in Paragraph 20. Thus, even if 'line' meant something less than all DeSoto automobiles, 'any * * * lines', as stated in Paragraph 20, could be discontinued. There is no indication in the Agreement tnat the term 'any' limited Chrysler from terminating production of all DeSoto 'lines.' The plain language should govern.
 
 
 47
 The majority reads 'any' to mean something less than all, however. Such a construction does not comport with the dictionary definition of 'any'.[4] 'Any' is clearly defined as specifying a choice of a limited or unlimited number of alternatives presented by the noun which it modifies. Thus, the provision for the discontinuance of 'any * * * lines * * * without notice' is the authority for the discontinuance of one, some, or all lines without notice.
 
 
 48
 With further reference to Paragraph 20, there appears to be agreement that the term 'model' refers to automobiles sold under the name DeSoto or Plymouth for a particular year, e.g., a 1961 DeSoto. The word 'models' as with 'lines' is employed in Paragraph 20 in the plural. The action of Chrysler consisted in the discontinuance of the 1961 model and future yearly models of the DeSoto and thus would have been expressly authorized by the right to discontinue 'any models * * * without notice' even if the word 'lines' was not included at all. This further evidences that Paragraph 20 authorized Chrysler's discontinuance of the production of the DeSoto automobile.
 
 
 49
 Given Buono Sales's concession that Paragraph 20 authouizes the discontinuance of any lines or any models, it appears imperative to read the plain language as authorizing the total discontinuance of the DeSoto production. A rapid curtailment of production just short of total discontinuance could as significantly affect a dealer's DeSoto business as total discontinuance. Furthermore, Paragraph 20 authorizes Chrysler to 'discontinue any or all parts.'[5] Without parts the direct dealers' sales of the DeSoto automobiles would create an impossible business situation. In sum then, the contracting parties would not have intended to authorize such an anomaly, permitting partial but not total discontinuance of DeSoto production, although the effect of either would more than likely be similar.
 
 
 50
 Buono Sales and the other eight dealers whose suits now depend on the disposition of this appeal all had arrangements to deal in both the DeSoto and Plymouth automobiles. They now have agreements to deal in both the Plymouth and Valiant automobiles. Paragraph 20 cannot be meaningfully construed without considering the continued existence of other Chrysler automobils in the hands of the direct dealers. Paragraph 20 is entitled: 'Change of Models, Parts and Accessories Declared Obsolete or Discontinued.' That language indicates that Paragraph 20 grants to Chrysler the right to make adjustments in the continuing business relationship it has with its direct dealers. Paragraph 20 does not appear to authorize Chrysler's justifying a permanent elimination of all automobile supply from all of Chrysler's divisions to the direct dealers, in the absence of a formal Paragraph 5 Agreement modification. The plain language of Paragraph 20, however, in our view authorizes the discontinuance of those automobiles which will at least assist Chrysler in its adjustment to changed market conditions, without terminating the sale to the direct dealers of all automobiles from its divisions with which the direct dealers are under contract. Introduction of Valiant and termination of the DeSoto 'models' and 'lines' was such an adjustment. This construction is reasonable and squares with the commercial history of the automobile industry. The explicit language of Paragraph 20 would seem to authorize the discontinuance of DeSoto automobiles. The intent of the parties was to allow Chrysler to gauge its production by the contingencies of the market.
 
 
 51
 Other paragraphs of the Direct Dealer Agreement support such a reading of Paragraph 20. Paragraphs 7, 10, 13 and 28 of the Agreement recognize circumstances in which Chrysler may not be able to perform in full its obligations and is, therefore, relieved of liability therefrom. Paragraph 7 provides:
 
 
 52
 'To the extent that DE SOTOPLYMOUTH for any reason other than DIRECT DEALER'S failure to submit orders or arrange payment, delivers to DIRECT DEALER less than the number of new De Soto or Plymouth passenger cars that represents DIRECT DEALER'S Minimum Sales Responsibility as defined above, DIRECT DEALER'S Minimum Sales Responsibility will be proportionately reduced.'
 
 Paragraph 10 tells us that:
 
 53
 '* * * DE SOTO-PLYMOUTH will not be liable for delay or nondelivery of products ordered nor will anything in this agreement obligate DE SOTO-PLYMOUTH to deliver to DIRECT DEALER any particular number of new De Soto or Plymouth passenger cars.'
 
 
 54
 Paragraph 13 lays out a program by which Chrysler must either help a dealer in difficulty, through sales promotion techniques or, failing to so act, must provide a dealer with an allowance per each left-over automobile on the day of the announcement to the public of the new yearly model. But, paragraph 13 provides that appellee does not have to so proceed if:
 
 
 55
 '* * * fire, flood, strikes or other labor disputes, accident, war, riot, insurrection, acts of government, governmental regulation or other circumstances have not substantially affected the availability of De Soto or Plymouth passenger cars at the time of announcement to the public of new yearly models. * * *'
 
 Finally, Paragraph 28 provides:
 
 56
 'In addition to any other exemption from liability specifically provided for in this agreement, neither DIRECT DEALER nor DE SOTO-PLYMOUTH will be liable for failure to perform its part of this agreement when the failure is due to fire, flood, strikes or other labor disputes, accident, war, riot, insurrection, acts of government, government regulation or other circumstances beyond the control of the parties.'
 
 
 57
 A reading together of Paragraphs 7, 10, 13 and 28 demonstrates that the contracting parties were aware that circumstances could arise which would excuse Chrysler both from the production of at least some automobiles and certain collateral performance. It has been suggested that the phrase 'other circumstances beyond the control of the parties' appearing in Paragraphs 13 and 28 is limited by the rule restricting the phrase to events of the same nature or class as the specifics preceding it. Such an argument provides little leverage for Buono Sales. Economic depression of the entire market or a part thereof certainly is as serious to the automobile industry as the effect of the specific arts articulated in Paragraphs 13 and 28. The history of the industry as set forth in the record reflects this seriousness. Thus, we feel that market conditions were problems to which Paragraphs 13 and 28, as well as Paragraphs 7 and 10, were addressed.
 
 
 58
 Chrysler suggests that Paragraph 10, without more, provides ample basis for discontinuing the DeSoto automobile, without liability for breach of contract flowing therefrom. Though we have applied that Paragraph solely as support for our reading of Paragraph 20, an application of the law of Michigan by which this contract specifies it is to be construed, as embodied in a decision of the Supreme Court of Michigan, F. H. McClintock Co. v. Truxell Sales & Service, Inc.,[6] would appear to support Paragraph 10, even standing alone, as being dispositive of the problem adversely to Buono Sales.
 
 
 59
 In McClintock, plaintiff was a dealer, such as Buono, and defendant was a distributor of Chrysler. Agreements between plaintiff and defendant had been executed for the supply and sale of DeSoto and Plymouth automobiles. They provided, among other things, for defendant to give not less than 90 nor more than 95 days' written notice for termination. The following provision also appeared:
 
 
 60
 'Direct dealer shall have the right to accept, in whole or in part, any or all orders received, and shall not be liable for any loss or damage resulting from its failure to ship or deliver goods ordered.'
 
 
 61
 Subsequently, defendant sent an 'immediate effective' notice of termination to plaintiff and no longer supplied either DeSotos or Plymouths. Plaintiff brought suit claiming damages for loss of sales during the 90 days period until the notice became effective.
 
 
 62
 The Michigan Supreme Court ruled that the explicit language of the agreement stating that defendant could not be held 'liable for any loss or damages resulting from its failure to ship and deliver goods ordered,' language identical in import to that in paragraph 10, insulated defendant from liability, as Chrysler here urges. Specifically the Court said:
 
 
 63
 'We are obliged to consider the agreement in its entirety, indluding the effect of the above-quoted clause as well as others. We cannot make a new agreement for the parties. Defendant never accepted the orders on which plaintiff's claim for damages is based. By the explicit language of the agreement, it cannot be held 'liable for any loss or damages resulting from its failure to ship and deliver goods ordered.' * * *' At p. 287, 297 N.W. at p. 494.
 
 
 64
 As a pronouncement of the highest court of Michigan the decision should be given its due weight in support of Chrysler's position herein.
 
 
 65
 Paragraph 21[7] entitled 'Termination' adds to the light shed on Paragraph 20 by Paragraphs 7, 10, 13 and 28. In it the instances in which Chrysler, automatically or on ninety days' notice, may terminate any Direct Dealer Agreement, relate to either the conduct of a dealer or circumstances economic or otherwise to which a dealer may be subject. As noted above, many other paragraphs of the Agreement excuse Chrysler from the obligation of contract performance based on conditions directly affecting Chrysler, conditions which are unrelated to the conduct of a dealer or circumstances in which a dealer is placed. But, as to Paragraph 21, the termination provision covers ground not previously dealt with in other paragraphs, namely, that conduct of a dealer or a situation in which a dealer may be placed which will excuse the manufacturer from performance. A gap is thereby left, which can appropriately be closed by a reasonable interpretation of Paragraph 20 and the other provisions of the contract as have been discussed above.
 
 
 66
 -- III--
 
 
 67
 Even if Paragraph 20 of the Direct Dealer Agreement and the other supporting paragraphs could not reasonably be construed to authorize the discontinuance of DeSoto automobile production, both the telegram and form letter of November 18, 1960 sent to all DeSoto direct dealers was sufficient to constitute a modification under Paragraph 5 of the Agreement, effective, however, after 35 days had elapsed. The absence of any reference to Paragraph 5 in the telegram and letter, and Chrysler's attempt to take advantage of Paragraph 5 to effect an immediate change, do not turn the issue adversely to Chrysler. All features of the modification procedure but the 35 day notice aspect were adhered to. Buono Sales and the other direct dealers were given adequate substantive notice. A mere change in the technical language of Chrysler's communications would not have improved the quality of the notice given them. The direct dealers could not have understood but that Chrysler was discontinuing production of the DeSoto automobile. But for the necessity of moving the effective date of the notice 35 days ahead from November 18, 1960 to December 22, 1960, it does not appear to us that there is any genuine difficulty with Chrysler's having adequately invoked Paragraph 5 of the Agreement. Thus, at the very most, Paragraph 20 aside for the moment, Buono Sales and the other direct dealers would be entitled to offer no more than their proof of damages covering the 35 day period prior to the date the modification notice became effective.
 
 
 68
 -- IV--
 
 
 69
 Buono Sales also sued for tortious interference with business relationships and a prospective economic advantage. Shortly after the discontinuance of DeSoto automobile production, the Dodge division of Chrysler circulated a nine panel brochure to certain DeSoto owners, in one panel of which it was stated that Dodge dealers were 'best qualified to give your DeSoto the genuine factory-approved service it deserves.'[8] Buono Sales contends that such action was creative of a commercial tort. The District Court found that the brochure was essentially a promotional effort to increase the sale of the 1961 Dodge. The record reflects that large automobile corporations are made up of a number of divisions, each division being in competition with the others and with divisions of other automobile corporations for the automobile market. Indeed, the Plymouth division of Chrysler's enterprise, as well as divisions of other automobile corporations, could have vied for the business represented by the then current DeSoto owners in much the same manner as Dodge did. As we see it the cases cited by the majority are appropriate to our problem neither on their facts nor on the law for which they stand. They are authority for the basic proposition that there is a right to be free from malicious and wanton interference with a business relationship and prospective economic advantage, an act for which Buono Sales does not charge Chrysler. We thus agree with the District Court that the use of the term 'best qualified' was merely puffing by the Dodge division, there being no suggestion by Buono Sales of fraud or misrepresentation in the brochure, or bad motive in its distribution. We find absent from the record evidence of any commercial tort.
 
 
 70
 For the reasons above discussed, we respectfully dissent from the majority view and would affirm the judgment of the United States District Court for the District of New Jersey.
 
 
 71
 HASTIE and WILLIAM F. SMITH, JJ., concur in this dissent.
 
 
 
 [1]
 Paragraph 21 of the Direct Dealer Agreement in part states:
 'DIRECT DEALER may terminate this agreement on not less than thirty (30) days' written notice.'
 2 * * * *
 'DIRECT DEALER'S Minimum Sales Responsibility will be determined separately for DeSoto and Plymouth passenger cars as follows:
 'From time to time, but at least once a year, DE SOTO-PLYMOUTH will compute the ratio of the number of new De Soto or Plymouth passenger cars, as the case may be, registered in the most recent 12-month period for which registration figures are available in the DE SOTO-PLYMOUTH Sales Region in which DIRECT DEALER is located to the number of all new passenger cars so registered in that Region. The ratio thus obtained will be applied to the number of all new passenger cars registered during the same 12-month period in DIRECT DEALER'S Sales Locality. The resulting number (and the percentage share of market that such number represents for the Sales Locality) will be DIRECT DEALER'S Minimum Sales Responsibility for this same twelve (12) month period, subject to such adjustment as is described below.
 'Where appropriate, DE SOTO-PLYMOUTH will adjust DIRECT DEALER'S Minimum Sales Responsibility to take into account the availability of passenger cars, local conditions, revisions in DIRECT DEALER'S Sales Locality description, the recent trend in DIRECT DEALER'S sales performance, and the other factors, if any, directly affecting sales opportunity.'
 
 
 [3]
 '* * * New car registrations of DeSotos in the United States dropped from 118,062 in 1955 to 23,063 in 1960. Plaintiff's own car sales of the DeSoto automobile, which in 1955 and 1956 had accounted for over 50% Of its total new car sales, accounted for only 12 out of a total of 89 new cars sold by it in 1960. * * *' Buono Sales, Inc. v. Chrysler Motors Corporation, 239 F.Supp. 839, 840 (D.N.J.1965)
 
 
 [4]
 See the all encompassing definition in Webster, New International Dictionary (2 ed. 1961)
 
 
 [5]
 At this point in the Paragraph the term 'all' is introduced, and used conjunctively with 'any.' Based upon the unambiguous dictionary definition of 'any' as encompassing 'all,' we are of the view that the mention of 'all' at this point is merely redundant and surplusage to the term 'any.' This use of 'all' cannot reasonably reflect an intention that the previous usage of 'any' alone is indicative that 'any' was meant to denote something less than 'all.'
 
 
 [6]
 297 Mich. 284, 297 N.W. 493 (1941)
 
 
 [7]
 Paragraph 21 states in part:
 'DIRECT DEALER may terminate this agreement on not less than thirty (30) days' written notice.
 'DE SOTO-PLYMOUTH may terminate this agreement on not less than ninety (90) days' written notice on (1) the failure of DIRECT DEALER to perform fully any of DIRECT DEALER'S undertakings and obligations of Paragraphs 7 through 10 and Paragraph 14 of this agreement, or (2) the death of any person listed in Paragraph 2 of this agreement, other than the death of DIRECT DEALER if he is an individual, or the failure of any such person so listed to continue his active and substantial participation in the management of DIRECT DEALER'S organization, or (3) a misrepresentation of or change in any of the ownership interests listed in Paragraph 3 of this agreement resulting in a transfer of majority control or interest in the capital stock or partnership interest of DIRECT DEALER, unless DE SOTO-PLYMOUTH has given written approval to such change, or (4) a disagreement dispute or controversy between or among principals, partners, managers, officers or stockholders of DIRECT DEALER that, in the opinion of DE SOTO-PLYMOUTH may affect adversely the operation, management or business of DIRECT DEALER, or (5) the conviction of DIRECT DEALER, or a partner, principal stock-holder, officer or manager of DIRECT DEALER of any crime that, in DE SOTO-PLYMOUTH'S opinion, may affect adversely the operation or business of DIRECT DEALER or the name, good will, or reputation of DE SOTO-PLYMOUTH, De Soto or Plymouth products or DIRECT DEALER.'
 'Notwithstanding the provisions above, this agreement will terminate automatically without notice from either party on: (1) the death of DIRECT DEALER if he is an individual, or (2) an attempted assignment of this agreement by DIRECT DEALER without the written consent of DE SOTO-PLYMOUTH, or (3) an assignment by DIRECT DEALER for the benefit of creditors, or (4) the admitted insolvency of DIRECT DEALER or of any partner of DIRECT DEALER if it is a partnership, or (5) the institution of voluntary or involuntary proceedings by or against DIRECT DEALER in bankruptcy or under insolvency laws or for corporate reorganization, arrangement, receivership or dissolution.'
 
 
 [8]
 Of the nine panels, eight advertised the alleged virtues and advantages of Dodge automobiles, at times as related to products of competitors other than DeSoto-Plymouth. A ninth panel contained the following:
 'Dear DeSoto Owner:
 'Your DeSoto was one of the best engineered, best built cars in its day. I hope it has given you good service. When you bought it, your DeSoto was far and away the most advanced car in its price class. But at that time, there was no full-size Dodge Dart or compact Dodge Lancer for you to compare when buying a new car.
 'Today, in 1961, Dodge offers you two distinct sizes of automobiles that incorporate many new engineering and quality features: the full-size Dodge Dart and compact Dodge Lancer. The Dodge Dart is priced model for model with Ford and Cheverolet. Lancer is priced right down the line with Comet, Falcon and Corvair.
 'Dodge engineering and convenience features are outlined on the following pages. We know you'll find them interesting to read about, and to try personally, when you visit your nearby Dodge dealer.
 'Whether or not you've decided about a new car-- your dependable Dodge dealer is a good man to know. He is best qualified to give your DeSoto the genuine factory-approved service it deserves. Your Dodge dealer has the trained, experienced mechanics and proper service facilities to handle all your service needs. The large, nationwide Dodge dealer organization stands ready with service when you travel, too.
 'May I take this opportunity to personally invite you to visit your Dodge dealer. Meet his service manager, look over his showroom and service facilities. You may even wish to drive in a new 1961 Dodge. Remember, whether it's a new automobile * * * or dependable service * * * you'll get a great deal with Dodge.
 Sincerely, BYRON J. NICHOLS Vice President, Chrysler Corporation General Manager, Dodge Division'