**BUONO SALES, INC., Appellant in 18,911**

**v.**

**CHRYSLER MOTORS CORPORATION, Appellant in 18,912.**

**Appeal of CHRYSLER CORPORATION, Appellant in 18,913.**

**Nos. 18911–18913.**

United States Court of Appeals, Third Circuit.

Argued April 2, 1971.

Decided Sept. 21, 1971.

2. Martin in fact signed a Union authorization card on January 31, 1969, about a week before her transfer on February 6, 1969.

Samuel Carotenuto, Reussille, Cornwell, Mausner & Carotenuto, Red Bank, N. J., for appellant in No. 18911 and appellee in Nos. 18912/18913.

Robert Ehrenbard, Kelley, Drye, Warren, Clark, Carr & Ellis, New York City, for appellant in Nos. 18912/13 and appellees in No. 18911 (Pitney, Hardin & Kipp,

Newark, N. J., Joseph Fortunato, Newark, N. J., on the brief).

Before FORMAN, SEITZ, and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Chief Judge.

On a previous appeal in this case we determined that Chrysler[1] was liable to plaintiff, a New Jersey automobile dealer, for discontinuing production of the DeSoto automobile in 1960. Our conclusion was based on a finding of breach of contract and tortious interference with plaintiff's business. Buono Sales, Inc. v. Chrysler Motors Corp., 363 F.2d 43 (3d Cir.) (en banc), cert. denied, 385 U.S. 971, 87 S.Ct. 510, 17 L.Ed.2d 435 (1966). Now, after remand and trial in the district court, we are asked by both sides to review the amount of damages which have been assessed against defendants and to consider for the first time the merits of plaintiff's claim under still a third theory of liability.

Plaintiff, Buono Sales, Inc., has been engaged since 1935 in the business of selling and servicing Chrysler products. In 1960, it was a dealer in DeSoto, Plymouth, and Valiant automobiles, operating in Hawthorne, New Jersey under a DeSoto-Plymouth Direct Dealer Agreement executed in 1957. On November 18, 1960, the President of Chrysler Motors Corporation notified plaintiff and more than 1600 other dealers that production of the DeSoto was being discontinued and that the car was being withdrawn from the market because a "drastic shift by the consumers" toward low-priced cars had resulted in a lack of interest in the DeSoto. Thereafter, Chrysler's Dodge division mailed a brochure to the owners of 1956–1959 DeSotos, suggesting that the recipients take their cars to Dodge dealers for servicing.[2] Since November 18, 1960, plaintiff has continuously operated as a single-line Plymouth dealer.

Plaintiff filed this action against Chrysler alleging breach of contract (Count 1), tortious interference with business (Count 4), and violation of the Automobile Dealers' Day in Court Act[3] (Count 6). The district court dismissed the complaint in its entirety. On appeal, this Court reversed, directed that judgment be entered in favor of plaintiff on Counts 1 and 4, and ordered a trial on the question of damages under both counts. Buono Sales, Inc. v. Chrysler Motors Corp., supra. Count 6 was not before this Court because the parties, by stipulation, had agreed that the statutory claim would be abandoned were Chrysler not found liable for breach of contract under Count 1.

On remand, the district court assessed damages of $30,000 on Count 1, awarded six cents nominal damages on Count 4, and dismissed Count 6. Chrysler now appeals from the judgment of the district court on Count 1, and plaintiff has filed a cross-appeal from the judgments entered on all three counts.

## BREACH OF CONTRACT

In our previous opinion, we held that Chrysler had breached its Direct Dealer Agreement with plaintiff by discontinuing production of the DeSoto:

"The contract before us is clear. Its unmistakable intent is to protect Chrysler as to its dealers in every

---

1. By stipulation, the parties have agreed that "the separate corporate entities of the two defendants are to be disregarded and that any acts of the defendant Chrysler Corporation shall be deemed to be the acts of the defendant Chrysler Motors Corporation." We shall use the term "Chrysler" to refer to both defendants collectively.

2. The nine-panel brochure extolled the virtues of the 1961 Dodge and was obviously intended to capture a share of the former DeSoto market. Included in the brochure was a letter from the General Manager of the Dodge Division, stating in part: "Whether or not you've decided about a new car—your dependable Dodge dealer is a good man to know. He is best qualified to give your DeSoto the genuine factory-approved service it deserves." For the full text of the letter, see Judge Forman's dissent in our prior opinion in this case, 363 F.2d at 56 n. 8.

3. 15 U.S.C. §§ 1221–1225.

foreseen contingency. It does not by its terms or impliedly give Chrysler the naked right to discontinue without contract cause, manufacturing and distributing to its dealers DeSoto automobiles. In so doing Chrysler broke the contract." 363 F.2d at 49.

On remand, plaintiff sought to recover as damages the profits it would have made in the future from the sale of De-Soto automobiles. Chrysler, however, claimed that plaintiff sustained no damages and was in fact better off without having to sell the DeSoto because, when the contract was breached, the DeSoto was an unprofitable commodity lacking in consumer interest.

Concluding that the automobile's relative unpopularity in 1960 was the result of defendant's gradual phasing out of the DeSoto rather than the normal operations of the market place, the district court calculated plaintiff's lost profits on the basis of its experience during the years 1955–1959. The court found that plaintiff's average net profits from De-Soto sales and service during those five years was $9,511.40, ruled that the De-Soto would not have remained a profitable commodity for more than three years beyond the date of Chrysler's breach, and therefore estimated plaintiff's lost profits to be $30,000. Although plaintiff claims that damages should have been projected over a much longer period, we must first consider Chrysler's contention that plaintiff suffered no damages at all because the De-Soto was in fact unprofitable.

In its determination of plaintiff's profits experience with the DeSoto between 1955 and 1959, the district court relied extensively on the expert testimony of Leon Kranztohr, a certified public accountant specifically engaged by the plaintiff to estimate the amount of damages attributable to Chrysler's breach. Essentially, Kranztohr began his calculations with a determination of plaintiff's gross profits from DeSoto sales and service during each of the five years between 1955 and 1959. With respect to new car sales, this figure was arrived at by deducting total wholesale cost and trade-in discounts from total sales revenue. Kranztohr then proceeded to subtract from gross profits certain variable expenses which he believed to be directly related to the DeSoto. In the case of new car sales, such expenses included insurance on plaintiff's inventory of new DeSotos; sales compensation and commissions; advertising, travel, and entertainment expenses; interest on finance charges; and a portion of the losses in the used car department deemed to be directly allocable to sales of new DeSotos. Similar expenses were deducted from plaintiff's DeSoto parts and service sales, including small tools, laundry, freight, policy adjustments, payroll taxes, and employee benefits. The result, which Kranztohr defined as plaintiff's "net profit" from the DeSoto, totalled $36,510.00 for sales of new DeSotos and $11,047.00 for DeSoto parts and servicing over the five-year sample period. By averaging the total net profits in both categories, Kranztohr testified that plaintiff had made an average of $9,511.40 per year from the DeSoto and had therefore lost this added amount of yearly income by virtue of Chrysler's breach.

Chrysler challenges on several grounds, the district court's reliance on the Kranztohr testimony. It first claims that the amount of plaintiff's net profits, if any, during the 1955–1959 period "is plainly of no probative value" since the issue is what "the DeSoto portion of the Agreement [was] worth on November 18, 1960." Since plaintiff sold only 12 new DeSotos during all of 1960 and, using plaintiff's own method of calculation, made a total net profit of only $192.00, Chrysler maintains that the district court vastly overestimated the value of the dealership agreement at the time of the breach. We disagree and think the district court properly refused to consider plaintiff's 1960 profits experience as an accurate basis for measuring damages.

■ The evidence indicates that, as early as 1958, Chrysler conceived of a plan to begin curtailing its production

of the DeSoto in order to gradually phase out the automobile and leave its dealers with single-line Plymouth franchises. Pursuant to this plan, in 1960 Chrysler drastically reduced the number of DeSoto series from four to two and the number of models from 18 to 6. The resulting reduction in the number of available cars obviously tended to decrease the amount of profit which DeSoto dealers would have otherwise realized. Since there is no evidence that such measures would have been taken by Chrysler had it not intended ultimately to discontinue the DeSoto entirely, we think the five-year period preceding 1960 was properly considered a more accurate representation of what plaintiff's profits would have been in the absence of Chrysler's breach. As the court below stated: "Since the normal operations of the market place were not the cause of the decline in the profits made by plaintiff, it would seem unduly harsh to restrict plaintiff to the 1960 figures in calculating its damages."

■ Chrysler next contends that, assuming the relevance of plaintiff's "net DeSoto profits" for the years 1955–1959, the district court erred in its computation of such profits. It argues: (a) that those variable expenses which the court deducted from plaintiff's gross DeSoto profits were allocated on an improper basis; and (b) that certain fixed expenses were erroneously not deducted at all. With respect to the former contention, Chrysler complains that such expenses as insurance, sales compensation and commissions, advertising, travel, and entertainment expenses, interest on finance charges, and used-car losses were apportioned between the Plymouth and DeSoto "not on the basis of their purpose," but on the basis of the relative percentage of cars actually sold. In other words, Chrysler says, "[i]f a salesman devoted 50% of his time to promoting DeSoto and 50% to Plymouth but sold three times as many Plymouths as DeSotos only 25% of his time would be charged to the DeSoto." Plaintiff's financial statements for the years in ques-

tion do not indicate a break-down between DeSoto and Plymouth for many of these expenses, and Chrysler has failed to suggest an alternative means of making the requisite allocations. We agree with the district court that, in the absence of more specific figures, an allocation based upon the percentage of DeSotos sold is a reasonably fair solution to the problem. As Kranztohr testified below:

"[W]e tried to take a general basis for many of these items. Some were possibly in our favor and some were against us, with an over-all average. There wasn't any great material difference. And it was pretty hard to determine whether these expenses resulted in sales or not in sales. So we took it as a result basis."

A more substantial issue is found in Chrysler's claim that damages cannot be based on a net profit figure from which there has been no deduction whatsoever of such fixed expenses as administrative salaries, real estate taxes and insurance, building maintenance and depreciation, auditing and legal expenses, and the cost of heat, light, and water. Plaintiff contends, and the district court agreed, that no offset should be made against gross profits because the breach did not relieve plaintiff of such expenses, which remained relatively constant both before and after 1960. Chrysler, however, places particular emphasis upon the fact that plaintiff's own financial statements show that the overall business lost a total of nearly $6000 between 1955 and 1959, as compared with a total loss of less than $1000 in the five years following the breach in which plaintiff sold only the Plymouth and Valiant. From this, Chrysler concludes that plaintiff did indeed benefit from the breach by being relieved of those fixed expenses necessary to maintain its DeSoto operation and by being able to devote more profitably to the Plymouth the exclusive use of its sales force, business facilities, capital, and credit.

■■ We agree with the view that where the plaintiff's overhead or fixed

expenses are not affected by the defendant's breach, no deduction should be made in calculating the profits which the plaintiff would have made had it not been for the breach. It is obvious that fixed expenses are an essential element in determining the net profits of any business and must, for accounting purposes, be allocated among each of the business' sales activities. Nevertheless, as we stated in Vitex Manufacturing Corp. v. Caribtex Corp., 377 F.2d 795 (3d Cir. 1967), it does not follow that a proportionate share of fixed expenses should be considered a cost factor in the computation of lost profits:

> "The point is that while these items all are paid from the proceeds of the business, they do not normally bear such a direct relationship to any individual transaction to be considered a cost in ascertaining lost profits." 377 F.2d at 799.

Furthermore, it is apparent that the fixed expenses of a business must be paid from the profits remaining after all direct costs have been paid. Unless damages restore the latter amount to plaintiff, it will not be fully compensated for the breach. As Kranztohr correctly pointed out, even a business which has suffered a net loss before the breach is entitled to damages if the breach deprives it of additional revenue which it could have used to help defray its overhead expenses.

■ This leads us directly to the first of what we consider to be the two critical errors in the district court's computation of damages. The law is clear that if a defendant's breach of contract frees the plaintiff to profitably utilize its facilities in some other way, the amount of compensating advantage thus derived must be subtracted from the

profit which the plaintiff lost because of the breach. Burks v. Sinclair Refining Co., 183 F.2d 239, 243–244 (3d Cir. 1950); Restatement of Contracts § 336, Comment a (1932); Note, Lost Profits as Contract Damages: Problems of Proof and Limitations on Recovery, 65 Yale L.J. 992, 1007 & n. 90 (1956). The law of New Jersey, which we deem applicable in the absence of any contention to the contrary, appears to be consistent with this approach. In the leading case of Apex Metal Stamping Co. v. Alexander & Sawyer, Inc., 48 N.J.Super. 476, 138 A.2d 568, 573 (App.Div.1958), the Appellate Division of the New Jersey Superior Court established the rule that the plaintiff has the burden of proving "all those elements reasonably necessary to establish the amount of its lost profits" and must therefore overcome an "initial assumption" that he has been freed by the breach to utilize his overhead with equal profit.[4]

■ In the present case, the district court found that Chrysler, at the time it decided to terminate the DeSoto, also greatly expanded its Plymouth line, thereby making available to its former DeSoto-Plymouth dealers an additional number of models covering a broader price range. The court specifically noted that,

> "in its calculation of future profits * * *, plaintiff has ignored the effect of increased Plymouth sales. * * * While it is true that in 1959 Plymouth had only 4 series, the fact is that this number was subsequently increased to 16 series, with at least 4 in the middle price range. It is *very doubtful that plaintiff would have benefitted from this wide choice of Plymouths in recent years if defendant were still marketing the DeSoto.* The evidence clearly indicates that the decision to discontinue

4. Strictly speaking, the court in *Apex Metal* used this rule to require a deduction of overhead expenses from gross profits unless the plaintiff can successfully sustain the above-stated burden of proof. The damages formula we adopt in the present case does not provide for the deduction of overhead as such but is based on the same rationale and reaches the same ultimate result. Furthermore, it avoids the problem of ascertaining the amount of overhead which should be deducted where the plaintiff has been freed by the breach to use his facilities profitably but to a lesser extent than before the breach.

the DeSoto was interrelated with the decision to improve and expand the Plymouth line and to make that car the number one Chrysler product in its class. It further appears that since 1960, both Plymouth and Valiant sales have increased substantially, and that plaintiff profited thereby in its Passaic County sales territory." (Emphasis added.)

Although plaintiff claims that without the breach it would have been able to maintain prior DeSoto sales and, at the same time, more than double its Plymouth sales (as it did after 1960), we believe the findings of the district court strongly imply the contrary. We are unable to resolve this question with certainty, however, because the trial court made no findings as to what, if any, portion of plaintiff's profits after 1960 were made possible because of defendant's decision to terminate the DeSoto. In order to eliminate the possibility of a recovery for such profits by plaintiff, we remand the case to the district court, albeit regretfully, for a reassessment of damages. The proper measure thereof shall be the difference for the appropriate period between the amount of net profits[5] which plaintiff would have made from its sales of the DeSoto had it not been for the breach and the net profits which plaintiff was in fact able to make from the Plymouth solely by virtue of the breach. The latter figure represents the difference for the appropriate period between the net profits plaintiff would have made from the Plymouth after 1960 had it also continued selling the DeSoto and the net profits plaintiff did in fact make from the Plymouth after 1960.

Since we cannot tell whether the application of the above formula will again indicate that plaintiff sustained a recoverable loss from the breach, in the interest of justice, we proceed to consider the appropriate period of time for which damages, if found, should be awarded.

On the basis of the evidence before it, the district court concluded that the DeSoto would not have remained a profitable commodity for more than three years beyond the date of the breach, and it therefore projected plaintiff's average yearly DeSoto profits during the preceding five years over this period of time. Both sides take issue with this result. Relying on Paragraph 5 of the Direct Dealer Agreement, which permitted it to amend the contract in any manner it "deemed advisable" upon 35 days notice, Chrysler maintains that damages should be limited to those profits which plaintiff lost by reason of not being given a 35-day notice that the DeSoto was being discontinued.

When this case was last before us, a majority of the Court refused to "pass finally upon whether Chrysler under the 'deems advisable' grant could so amend the contract as to include its discontinuance of the manufacture of DeSoto passenger cars which would in effect terminate the agreement under the guise of amending it." 363 F.2d at 49. Now that the issue is squarely before us, we uphold the ruling of the district court that Chrysler's right to amend under Paragraph 5 did not include the right to provide for the discontinuance of the DeSoto. It is elementary that, absent a showing to the contrary, the wording of a contract is to be given its plain and ordinary meaning and that, if any ambiguity remains, the contract is to be interpreted so as to best effectuate the intention of the parties. Restatement of Contracts, §§ 235, 236 (1932) ; 4 Williston, Treatise on the Law of Contracts §§ 607, 610B (3rd ed. 1961). As it is used in the present contract, we think Chrysler's reservation of the "right to amend this agreement to the extent that [it] deems advisable" does not contemplate the insertion of a provision granting the right to terminate the DeSoto portion of the Agreement altogether. No

---

5. We use the term "net profits" in this paragraph as it has been defined by plaintiff: gross profits minus direct or variable expenses only.

Michigan authority to the contrary has been cited.[6] As defined in Black's Law Dictionary, an amendment is an "amelioration of the thing *without involving the idea of any change in substance or essence.*" (emphasis added) We cannot agree with Chrysler's interpretation of Paragraph 5 because the type of amendment it proposes would not only change but destroy the substance of the contract. The word "amend", as broad as it may be, is not synonymous with "revoke."

Furthermore, even if we were to agree that the meaning of the "deems advisable" clause is ambiguous, we find the construction put forth by Chrysler to be inconsistent with the intent of the parties. In the prior opinion of this court in this case, it was specifically pointed out that Chrysler entered into the Agreement with no intention of ever discontinuing the DeSoto:

"It is very clear from the contract itself that the thought that sometime in the future Chrysler might abandon the manufacture of DeSoto passenger automobiles was plainly not within Chrysler's thinking when it entered into its dealer agreements with Buono and the others." 363 F.2d at 44.

Rather, the parties expressly stated in the Agreement's Introduction that the purpose of their relationship was to provide for the sale and service of DeSoto and Plymouth cars, parts and accessories, and in Paragraph 5 they stated that they did not intend for the Agreement to have an expiration date. Under these circumstances, we are unwilling to construe the "deems advisable" clause to permit an amendment allowing for a unilateral termination of the contract in contravention of the parties' expressed intention.

Chrysler warns that our holding will "create an anomalous situation heretofore unknown in the automobile industry," since it will bind Chrysler to the perpetual manufacture of automobiles which changing market conditions have made unprofitable for all concerned. We have already stated the obvious answer to this argument. If Chrysler had wished to reserve the right to discontinue its DeSoto business if and when it chose to do so, it merely had to say so in the Agreement. 363 F.2d at 44. Since we conclude that Chrysler's right to amend did not include the right to insert a termination provision, we reject the contention that plaintiff's damages should be limited to the 35-day period following the breach.

Plaintiff has joined Chrysler in taking issue with the period over which the district court projected lost profits. It claims that it is entitled to all the profits it would have made from the DeSoto during the 27-year life expectancy of its general manager, Louis J. Bay. Plaintiff bases its argument on the following three paragraphs in the Direct Dealer Agreement: Paragraph 5, which states that the Agreement has no termination date; Paragraph 2, which states that Chrysler entered into the Agreement in reliance on Bay's active, substantial, and continuing personal participation in the dealership; and Paragraph 21, which gives Chrysler the right to terminate the Agreement on 90 days' notice after the death of Bay or upon his failure to continue his active and substantial participation in the management of the business. Although Paragraph 21 also gives Chrysler a right of termination in certain other situations, plaintiff argues that none of these contingencies has occurred and that it is therefore reasonable to assume that the Agreement would remain in effect throughout Bay's lifetime.

The district court rejected plaintiff's 27-year projection of lost profits as failing to face the "realities of the market place." Specifically, it relied on expert testimony indicating that by 1959 the DeSoto was rated the lowest in consumer acceptance of all medium-priced cars except possibly the Edsel, that the trend was continuously downward, and that a reversal of the trend was re-

6. Par. 30 of the Direct Dealer Agreement provides:

"This agreement will be interpreted and construed according to the laws of the State of Michigan."

mote despite a later resurgence in the general popularity of other cars in the same price range. The court concluded that, as of November 18, 1960, the DeSoto could not have remained profitable for more than three years. Based upon our examination of the record, we do not consider this finding to be clearly erroneous within the meaning of Rule 52(a) of the Federal Rules of Civil Procedure.

Nevertheless, we do believe that the district court erred in its method of projecting lost profits over this three-year period. In finding plaintiff's average yearly profit between 1955 and 1959 and assuming that that figure would remain constant for an additional three years, the court failed to allow for the continuous decline in the DeSoto's popularity. *Cf.* General Insurance Co. of America v. Pathfinder Petroleum Co., 145 F.2d 368, 369–370 (9th Cir.), cert. denied, 324 U.S. 844, 65 S.Ct. 679, 89 L.Ed. 1406 (1944). If, upon remand, plaintiff is found to have sustained a loss by virtue of the breach, an appropriate adjustment should be made to plaintiff's past profits experience in order to accurately reflect what would have been a continuing decline in profits during the three years after the date of the breach.

■ Finally, plaintiff contends that the district court erred in denying prejudgment interest. Under New Jersey law, a successful plaintiff in an action for breach of contract is not entitled to prejudgment interest as a matter of right where damages are unliquidated. Indeed, the rule appears to be that, unless considerations of justice and fair dealing clearly demand a different result, "interest should not be allowed where the damages are unliquidated and not capable of ascertainment by mere computation, or where a serious and substantial controversy exists as to the amount due under a contract." Jardine Estates, Inc. v. Donna Brook Corp., 42 N.J.Super. 332, 341, 126 A.2d 372, 377 (App.Div.1956); see General Electric Co. v. E. Fred Sulzer & Co., 86 N.J.Super. 520, 207 A.2d 346 (Law Div.1965), aff'd, 92 N.J.Super. 210, 222 A.2d 655 (App.Div.1966); cf. Hankin

v. Board of Educ., 47 N.J.Super. 70, 84, 135 A.2d 329, 337 (App.Div.), certification denied, 25 N.J. 489, 137 A.2d 114 (1957). *See also* Restatement of Contracts § 337(b) (1932). We believe the court below did not abuse its discretion in applying this standard to the circumstances of the present case. Should damages be awarded to plaintiff upon remand, the district court is free to adhere to its prior decision on prejudgment interest.

## TORTIOUS INTERFERENCE WITH BUSINESS

■ In its previous opinion, this court found that Chrysler's mailing of a certain brochure to owners of 1956–1959 DeSotos constituted a tortious interference with plaintiff's business. The brochure suggested that such owners take their cars to Dodge Dealers for servicing. This court found that it was part of a "carefully planned method of enticing plaintiff's DeSoto customers away from plaintiff and to defendant's active Dodge and Chrysler dealers." On remand, the district court found that plaintiff could not prove any actual damages and awarded six cents nominal damages. Plaintiff now concedes that it can show no actual damages but claims that punitive damages were appropriate because of the "willful and wanton nature of Chrysler's acts" in reckless disregard of the rights of its DeSoto dealers. See Grillo v. Board of Realtors, 91 N.J.Super. 202, 219 A.2d 635 (Ch.Div.1966).

The district court found that, "in mailing the brochure, defendant [Chrysler] was motivated only by a desire to promote its own business, and not by malice, ill-will, or evil motive." We think such a finding negates the necessary malice or fraudulent motive. The fact that we previously characterized the tort as "intentional" did not mandate the granting of punitive damages. In any event, we cannot say that the district court abused its discretion in denying punitive damages. See Neigel v. Seaboard Finance Co., 68 N.J.Super. 542, 173 A.2d 300 (App.Div.1961).

## AUTOMOBILE DEALERS' DAY IN COURT ACT

The district court dismissed plaintiff's claim under the Act. The parties agree that a dealer has a cause of action under the Act[7] only if he shows that his contract was terminated in bad faith, and that "bad faith" requires evidence of "coercion, intimidation," or threats thereof by the manufacturer. Plaintiff argues that Chrysler's refusal to deliver DeSotos constituted "the ultimate in coercion and intimidation." On the contrary, we think the legislative history implies that termination alone will not violate the statute. Rather, it must have previously been used as a threat in an attempt to force the dealer to do certain things. Examples given in the House Report include a manufacturer's pressure on a dealer to accept cars, parts, etc. which the dealer does not want or to handle exclusively or sell a quota of parts, accessories, etc. House Report No. 2850, 1956 U.S.Code Cong. & Admin.News pp. 4596, 4603. These examples indicate that Congress was really trying to reach border-line antitrust violations. In fact, the purpose of the Act was to "supplement the anti-trust laws." Id. at p. 4596. The district court could find no evidentiary basis to support the claim and we agree. Furthermore, there was no "wrongful demand which will result in sanctions if not complied with." Berry Bros. Buick, Inc. v. General Motors Corp., 257 F.Supp. 542 (E.D.Pa.1966), aff'd, 377 F.2d 552 (3rd Cir. 1967). We therefore affirm the district court's disposition of this claim.

The judgment of the district court granting compensatory damages under Count I will be vacated and the matter remanded for a new trial of the damage issue in accordance with this opinion. The judgment of the district court on Counts 4 and 6 will be affirmed.

---

7. Section 1222 of the Act provides:

"An automobile dealer may bring suit against any automobile manufacturer engaged in commerce, in any district court of the United States in the district in which said manufacturer resides, or is found, or has an agent, without respect to the amount in controversy, and shall recover the damages by him sustained and the cost of suit by reason of the failure of said automobile manufacturer * * * to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer: *Provided,* That in any such suit the manufacturer shall not be barred from asserting in defense of any such action the failure of the dealer to act in good faith."

The term "good faith" is defined as follows in § 1221(e) of the Act:

"The term 'good faith' shall mean the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: *Provided,* That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith."