

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| El Coquí Landfill, Inc., h/n/c Waste Management de Puerto Rico<br><br>        Recurridos<br><br>                v.<br><br>Municipio de Gurabo;<br>Consolidated Waste Services,<br>Corpág. h/n/c Conwaste<br><br>Municipio de Gurabo<br><br>        Peticionario | Certiorari<br><br>2012 TSPR 141<br><br>186 DPR ____ |

Número del Caso: AC-2010-110

Fecha: 20 de septiembre de 2012

Tribunal de Apelaciones:

        Región Judicial de Caguas

Abogado de la Parte Peticionaria:

        Lcdo. Roberto Bonano Rodríguez

Abogados de la Parte Recurrida:

        Lcda. Liana Gutiérrez Irizarry
        Lcdo. Luis R. Pérez Guisti

Materia: Contratos – Cómputo de gastos operacionales en partida de lucro cesante otorgada por incumplimiento de contrato.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Coquí Landfill, Inc.,
h/n/c Waste Management de
Puerto Rico
        Recurridos

        v.                          AC-2010-110

Municipio de Gurabo;
Consolidated Waste Services,
Corpág. h/n/c Conwaste

    Municipio de Gurabo
        Peticionario


    Opinión del Tribunal emitida por la Jueza Asociada señora FIOL MATTA


En San Juan, Puerto Rico, a 20 de septiembre de 2012.

Hoy nos corresponde resolver si los gastos operacionales de un demandante deben deducirse de la partida de lucro cesante otorgada a éste para compensar por la ganancia dejada de percibir producto de un incumplimiento de contrato. En particular, examinaremos si existe alguna distinción entre los gastos operacionales que varían según el volumen de negocio de la empresa y los gastos fijos que no guardan relación con las fluctuaciones en el volumen del negocio. De contestarse en la afirmativa estas interrogantes, debemos determinar cómo llevar a cabo ese cómputo.

I

El 23 de octubre de 1998, El Coquí Landfill ("El Coquí" o "Waste Management") presentó una demanda de cobro de dinero e incumplimiento de contrato contra el Municipio de Gurabo reclamando el pago de $584,634.58 por servicios relacionados con el depósito de desperdicios. Durante el transcurso de ese pleito, las partes llegaron a un acuerdo extrajudicial, en el que el Municipio se comprometió a pagar la mitad de la deuda reclamada y, a cambio de la condonación del monto restante, suscribió un contrato de exclusividad por cinco años con El Coquí para el depósito de desperdicios sólidos recolectados por el Municipio.[1] La transacción fue aprobada nuevamente por la Legislatura Municipal y recogida en un "Contrato para la Disposición de Desperdicios Sólidos Municipales" que entró en vigor el 1 de noviembre de 2002 y terminaba el 31 de octubre de 2007. De conformidad con los términos del contrato, el Municipio se comprometió a transportar todos los desperdicios recolectados y depositarlos en el vertedero de Waste Management en Humacao. Las partes acordaron que, si se privatizaba el recogido de los desperdicios, el Municipio requeriría al contratista que los transportara para

---

[1] El contrato firmado por las partes incluye una tabla para el cómputo del costo del servicio, el que varía según el volumen de los desperdicios depositados. En particular, las partes acordaron que El Coquí cobraría al Municipio una tarifa de 30 dólares por tonelada por los primeros 18 meses; 33 dólares por los próximos 12 meses; 36 dólares por los próximos 12 meses y 40 dólares por tonelada los últimos 18 meses. Sentencia del Tribunal de Primera Instancia, pág. 3; Apéndice petición de *certiorari*, pág. 51.

depositarlos en el vertedero de Waste Management.[2] El Municipio contó con asesoría legal en todas las etapas de los procedimientos, incluyendo las negociaciones y el perfeccionamiento del contrato.

Mientras estaba vigente su contrato exclusivo con Waste Management, el Municipio de Gurabo suscribió un "Contrato para Proveer Servicios de Recogido y Disposición de Desperdicios Sólidos no Peligrosos en el Municipio de Gurabo" con la compañía ConWaste. Mediante dicho contrato, que tenía fecha de comienzo del 1 de noviembre de 2003 y vencía el 31 de octubre de 2010, el Municipio le otorgó a ConWaste el "derecho exclusivo sobre el recogido, recolección, transporte y disposición de desperdicios sólidos en Gurabo".[3] A partir de la firma de ese segundo contrato, el Municipio y ConWaste continuaron depositando los desperdicios recogidos en Gurabo en el vertedero de Waste Management.

En febrero de 2006, mientras aún faltaba cerca de año y medio para que venciera el contrato con Waste Management, el Municipio dejó de depositar los desperdicios en el vertedero localizado en Humacao. Poco después, el 2 de mayo de 2006, el contrato entre el Municipio y ConWaste fue enmendado para concederle a ésta la facultad de determinar el lugar donde se dispondrían los desperdicios. De igual forma, ConWaste se hizo responsable de los costos de

---

[2] *Íd.*, pág. 4; Apéndice petición de *certiorari*, pág. 52.

[3] *Íd.*, pág. 5; Apéndice petición de *certiorari*, pág. 53.

depósito y disposición de los desperdicios.[4] Producto de esta enmienda al contrato, ConWaste comenzó a depositar los desperdicios en un vertedero en Fajardo que no le pertenecía a Waste Management. Tras percatarse de lo ocurrido, Waste Management escribió una carta a ConWaste informándole del contrato de exclusividad que tenía con el Municipio y solicitando que se respetara el mismo. A pesar de ello, ConWaste continuó operando según lo establecido en el contrato enmendado con el Municipio.

Tras un juicio en los méritos, el Tribunal de Primera Instancia declaró con lugar la demanda presentada por Waste Management contra el Municipio por incumplimiento de contrato y contra ConWaste por interferencia torticera. En cuanto a los daños, el foro primario determinó que los demandados debían pagar a Waste Management la cantidad de $1,229,401.44 en compensación por las ganancias dejadas de percibir a causa del incumplimiento, más el 4.25% en concepto de interés legal.

Para demostrar los daños, Waste Management presentó una tabla que resumía la cantidad de desperdicios que el Municipio había depositado en su vertedero durante los trece meses antes del incumplimiento. Al multiplicar dicha

---

[4] Previamente, el contrato disponía que las partes acordarían designar mediante común acuerdo el vertedero donde serían depositados los desperdicios recolectados. De igual forma, el Municipio asumió la obligación de pagar los costos del depósito de los desperdicios en el vertedero seleccionado. *Íd.* Desde que entró en vigor este contrato y hasta febrero de 2006, las partes habían acordado depositar los desperdicios en el vertedero de Waste Management, de forma que el Municipio pudiese cumplir sus obligaciones contractuales con dicha entidad.

cantidad por el precio acordado en el contrato, el demandante identificó los ingresos mensuales que percibió en dicho periodo. Tomando esto como base, estimó un promedio mensual y proyectó los ingresos dejados de percibir correspondientes a los meses restantes en el contrato.

La tabla presentada por Waste Management fue elaborada por el señor Félix Renta, contador público autorizado y gerente de contabilidad de Waste Management, quien testificó a favor de dicha compañía. En el contrainterrogatorio, se le preguntó al señor Renta si el análisis del ingreso dejado de percibir constituía un cálculo del ingreso bruto. El testigo contestó en la afirmativa.[5] Acto seguido, se le preguntó si ello quería decir que el análisis no contenía los costos reales en los que Waste Management hubiera incurrido si el Municipio no hubiese incumplido el contrato. El señor Renta lo negó, ya que, según expuso, no habían gastos asociados al volumen de desperdicios depositados en el vertedero.[6] Es decir, que los gastos eran fijos y no se afectaban por las fluctuaciones en el volumen de depósitos. Además, el abogado del Municipio le preguntó si la proyección realizada representaba alguna cantidad neta: "O le pregunto, ¿en algún momento dado ustedes hicieron un estimado de costos para ver de [sic] cuánto de esta cantidad se le iban en

---

[5] Transcripción del juicio en sus méritos, pág. 86; Apéndice petición de Apelación, pág. 678.

[6] Íd. "[N]o hay costos fijos asociados a ese volumen".

gastos operacionales a usted?", a lo que el señor Renta contestó "[n]o, no se hizo ningún análisis de esa manera".[7] Por último, el representante legal del Municipio preguntó: "O sea que, sencillamente, usted preparó la tabla, pero no preparó otra con los estimados de costo sobre la operación de haber depositado desde febrero del dos mil seis (2006) hasta octubre del dos mil siete (2007), ¿verdad?". El señor Renta contestó en la afirmativa.[8]

Inconforme con la determinación del foro de instancia, los codemandados recurrieron al Tribunal de Apelaciones señalando la comisión de varios errores, entre ellos que el contrato suscrito entre el Municipio y Waste Management era inválido por no contener una cláusula de rescisión y que hubo vicio de consentimiento por dolo. Además, alegaron que la partida de $1,229,401.44 incluía costos operacionales ("*overhead*") que no debían compensarse, sino que, por el contrario, debían deducirse del cómputo de daños. Es decir, que la partida de daños debía incluir únicamente las ganancias <u>netas</u> que Waste Management dejó de devengar por razón del incumplimiento. En particular, el Municipio cuestionó la falta de un informe de costos o gastos que justificara la partida otorgada, más allá de la tabla que demostraba la cantidad de depósitos realizados antes del incumplimiento y que sirvió de base para proyectar los

---

[7] *Íd.*, pág. 89; Apéndice petición de Apelación, pág. 681. Acto seguido, el abogado del co-demandado preguntó nuevamente: "No se hizo", a lo que el señor Renta ripostó: "No". *Íd.*

[8] *Íd.*

ingresos correspondientes a los meses que restaban en el contrato.[9] El Tribunal de Apelaciones confirmó el dictamen del foro primario.

El Municipio recurrió a este Tribunal mediante recurso de apelación alegando los mismos errores presentados ante el foro apelativo. En cuanto al cómputo de daños, el Municipio alega que el Tribunal de Primera Instancia "nunca realizó estimado de costo para ver cuánto conllevaba el gasto operacional y poder determinar su alegada pérdida neta".[10] En particular, cuestiona la insuficiencia del testimonio del señor Renta, pues éste aceptó que no analizó el impacto de la merma en depósitos sobre los gastos operacionales del vertedero.

El 6 de mayo de 2011, otorgamos a Waste Management un término de veinte días para que mostrara causa por la cual no debíamos expedir el auto y modificar la sentencia del Tribunal de Apelaciones en cuanto a la partida de daños concedidos. En cumplimiento con nuestra orden, Waste Management presentó dos argumentos principales. En primer lugar, insiste en que se trata de un asunto de credibilidad, que el tribunal de instancia creyó el testimonio del perito sobre las pérdidas económicas sufridas por Waste Maganement y que debe darse deferencia a

---

[9] También cuestionó el que Waste Management haya utilizado un periodo de trece (13) meses para hacer sus cálculos, ya que ello permitió incluir en dos ocasiones separadas el mes de enero. Los demandados alegan que eso infló indebidamente las proyecciones, pues enero es uno de los meses con mayores depósitos de desperdicios por razón de las fiestas navideñas.

[10] Apelación, pág. 19.

esa determinación. Para la demandante, la tabla presentada y aceptada por el Tribunal de Primera Instancia, en unión al testimonio del señor Renta, es suficiente para determinar las "ganancias" que generó Waste Management justo antes del incumplimiento y para proyectar lo que debió haber recibido durante la vida restante del contrato.[11] Waste Management enfatiza en que este testimonio no fue refutado y que el Municipio no presentó prueba que estableciera otro cálculo en cuanto a los daños, particularmente sobre los alegados gastos operacionales que debieron deducirse.[12] Lo que es más, argumenta que, en su testimonio, el señor Renta expresó que "Waste Management no incurría en gastos o costos adicionales que estuvieran asociados a la disposición de los desperdicios sólidos en el vertedero de Humacao".[13] Insiste que, "[e]n cuanto a los costos incurridos por Waste Management, éstos no incrementaron con el volumen de toneladas de basura. En la operación de un vertedero, los costos incurridos mensualmente son constantes. Ello así, ya que el vertedero ya está construido y el mantenimiento que conlleva el mismo es el mismo independientemente de la cantidad de basura

---

[11] (Énfasis suplido) Moción en Cumplimiento de Orden, págs. 4-5.

[12] "Este se limita a argumentar, a manera de ejemplo, que se [debieron] descontar los gastos operacionales incurridos por Waste Management. Nótese que esta argumentación se basa en alegados "gastos" que no fueron presentados ni probados por el Municipio ni por ConWaste". Íd., pág. 7. Además, señala que "[dichos] alegados "gastos" ni siquiera fueron investigados por las partes demandadas en el proceso de descubrimiento de prueba". Íd., n. 2.

[13] Íd., pág. 8.

depositada. De igual forma, la empleomanía [*sic*] y equipos utilizados es el mismo, y tampoco dependen del volumen de basura".[14]

En segundo lugar, Waste Management propone que hagamos una distinción entre los gastos operacionales fijos y los gastos que varían según el volumen de negocios de una empresa. Para ello, cita varios casos de otras jurisdicciones, incluyendo la federal, en las que se ha resuelto que los gastos operacionales fijos, conocidos como "*overhead*", no deben ser deducidos de una partida de daños. La recurrida sostiene que como los gastos operacionales fijos no son deducibles de dicha partida como cuestión de derecho y el tribunal de instancia determinó, como cuestión de hecho, que Waste Management no incurría en gastos operacionales que se afectaran con los cambios en el volumen de depósitos de desperdicios en su vertedero, se debe confirmar la decisión del Tribunal de Apelaciones, incluyendo la partida de daños otorgada por el foro de instancia. Tomando en consideración los escritos de las partes y el derecho aplicable, procedemos a acoger el recurso como un *certiorari*, expedir el auto y resolver.

II

El artículo 1059 de nuestro Código Civil establece que "[l]a indemnización de daños y perjuicios corresponde no sólo al valor de la pérdida que haya sufrido, sino también el de la ganancia que haya dejado de obtener el acreedor,

---

[14] *Íd.*

salvo las disposiciones contenidas en las secciones siguientes".[15] Como explica el tratadista Manresa, este artículo atiende dos tipos de daños. En primer lugar, ordena compensar a la persona que ha sido privada de lo que ya tenía. A esto se le conoce como daño emergente o positivo. En segundo lugar, también provee compensación cuando se impide a una persona aprovecharse de lo que le hubiera correspondido. A esta segunda modalidad de daños se le conoce como lucro cesante o daño negativo.[16] Según Manresa, "[e]n ambos casos, la realidad del perjuicio y la justicia de la reparación tiene[n] igual evidencia".[17] De la misma forma, Castán Tobeñas vincula directamente el concepto de "lucro cesante" al mandato del Código Civil de reparar la "ganancia dejada de obtener".[18] Ello aplica tanto al contexto contractual como al extracontractual.[19]

_____

[15] 31 L.P.R.A. sec. 3023.

[16] J. M. Manresa y Navarro, Comentarios al Código Civil Español, Ed. Revs, Madrid, 1967, pág. 276. Véase, además, C. Valverde y Valverde, Tratado de derecho civil español, Tomo III, págs. 113-116.

[17] Manresa, op.cit., pág. 276. Ahora bien, el tratadista reconoce que existe cierta diferencia entre ambas formas de daños y perjuicios. Según éste, en el caso del lucro cesante, "hay en éste una fatal concurrencia de los caracteres de futuro, contingente, variable y, sobre todo discutible, que contrastan de modo notable con aquellas relativas a seguridad de prueba y facilidad de apreciación", como en el daño emergente. Íd., pág. 277. Igual cautela sugiere Castán Tobeñas al expresar que el daño negativo debe ser calculado con mayor prudencia que el llamado daño positivo. J. Castán Tobeñas, Derecho civil y foral, Ed. Revs, Madrid., 1983, pág. 243.

[18] Castán, op.cit., pág. 242.

[19] P. J. Femenía López, Criterios de delimitación del lucro cesante extracontractual, Valencia, 2010, pág. 201.

Como puede apreciarse del texto del artículo 1059, lo que se compensará al acreedor serán las ganancias dejadas de percibir, no necesariamente todo ingreso futuro frustrado.[20] En particular, nuestra jurisprudencia demuestra que los daños compensables en casos de lucro cesante se refieren a la ganancia neta insatisfecha por la conducta del demandado, no al ingreso bruto. Tan atrás como en 1940 resolvimos que la compensación corresponderá a "los daños sufridos por razón de la pérdida de beneficios netos".[21] Más de sesenta años después, empleamos un análisis similar al resolver que para calcular el lucro cesante de un trabajador que recibe un salario fijo se tomará como punto de partida su salario bruto, mientras que el de un trabajador que no recibe un salario fijo se calculará a partir de su ingreso neto.[22] De esa manera se cumple el objetivo de nuestra normativa sobre responsabilidad civil, tanto contractual como extracontractual, de reparar el daño causado, devolviendo al agraviado a su situación original.

---

[20] Manresa ofrece como ejemplo un caso de una venta con fines de reventa frustrada por la conducta del demandado. En ese ejemplo, existe un "implícito perjuicio por el precio de ésta en cuanto había de ser superior al de venta". Manresa, *op.cit.*, pág. 277, citando la Sentencia del Tribunal Supremo de España de 31 de octubre de 1936. En varias ocasiones en su tratado, Manresa enfatiza el elemento de la ganancia: "valor de la ganancia dejada de obtener" *Íd.*, pág. 283; "pago de la diferencia del precio" *Íd.*, pág. 287. Véase, además, M. Albadalejo, Derecho Civil, Tomo II, Vol. 1, Librería Bosch, Barcelona, 5ta ed., pág. 199.

[21] (Énfasis suplido) R. Muñiz de León & Co. V. Melón Hnos. & Cía, 56 D.P.R. 330, 340 (1940). Dicho caso trató de una causa de acción por embargo ilegal.

[22] S.L.G. Rodríguez v. Nationwide, 156 D.P.R. 614 (2002).

Como señala Castán, "[e]l derecho a la indemnización no puede implicar un enriquecimiento, sino sólo obtener el resarcimiento del daño efectivo".[23] Por tanto, al computarse la indemnización, debe descontarse "cualquier ventaja al acreedor" de manera que la partida otorgada refleje "el verdadero importe del daño".[24] En ese sentido, "[s]i el daño ha de ser real y efectivo, claro es que sólo podrá apreciarse deduciendo el valor patrimonial de las ventajas que el propio acto dañoso acarree a la persona interesada. Solo la diferencia podrá considerarse en Derecho pérdida sufrida o ganancia dejada de obtener".[25] Por su parte, el Tribunal Supremo de España ha resuelto que la partida de daños por lucro cesante "debe ajustarse al beneficio <u>neto</u>, a la verdadera '<u>ganancia</u>' que se deja de obtener", pues, de lo contrario, la compensación perdería su característica de restitución.[26] Por tanto, hace falta "reducir la indemnización por lucro cesante concedida a la ganancia neta que resulte de tomar en consideración los <u>gastos efectuados</u> … para deducirlos".[27]

De lo anterior surge que, en cuanto a los gastos operacionales, particularmente en el contexto contractual, la "ventaja" a deducirse de la partida por lucro cesante

---

[23] Castán, *op.cit.*, pág. 253.

[24] *Íd.*

[25] Manresa, *op.cit.*, pág. 253, citando al tratadista Roces.

[26] (Énfasis suplido) Sentencia de 19 de diciembre de 2005, Repertorio de Jurisprudencia 295, Aranzadi.

[27] (Énfasis suplido) *Íd.*

consiste de aquellos gastos en los que el demandante hubiera tenido que incurrir si el demandado hubiese cumplido con su obligación. Para el tratadista Femenía López, esto es cónsono con la necesidad de identificar "las deducciones del daño resarcible para calificar la concurrencia de factores que disminuyen la obligación resarcitoria del deudor, como consecuencia de la ventaja que aquéllos reportan al mismo acreedor, cuestión a la que conceptualmente se ha denominado *compensatio lucri cum danno*".[28] Según el autor:

> El fundamento legal de la figura se encuentra en el propio artículo 1.106 [equivalente al 1059 nuestro] del Código civil, que al disponer que la indemnización de daños y perjuicios comprende no sólo el valor de la pérdida sufrida, sino también el de la ganancia dejada de obtener, está diciendo que la confirmación del daño resarcible debe hacerse sobre la base del perjuicio realmente experimentado, para lo cual tendrá que computarse todos aquellos lucros o provechos dimanantes del daño, que signifiquen un paliativo o aminoración del quebranto patrimonial sufrido por el perjudicado.[29]

En ese marco normativo, Femenía López hace referencia a una Sentencia de la Audiencia Provincial de Soria que discutió la partida de daños en un caso de corte de suministro eléctrico. En esa ocasión, la sala provincial resolvió que al calcularse el lucro cesante había que deducir "las partidas correspondientes a ciertos gastos

---

[28] Femenía López, *op.cit.*, pág. 201.

[29] (Énfasis suplido) *Íd.* De esa forma, se aplica adecuadamente el "principio de reparación íntegra, que obliga a reparar todo el daño, pero sólo el daño; ni más ni menos". *Íd.*, pág. 202.

fijos como los de amortización de maquinaria no utilizada ni desgastada durante el lapso temporal en que la planta permaneció paralizada, además de los correspondientes a materias primas o energía".[30] En esa misma dirección, Femenía López ofrece como ejemplo el caso de la paralización de vehículos destinados a actividades empresariales. En ese caso, "deberán detraerse determinados gastos que dejan de generarse y que suponen una compensación para el perjudicado, siendo el más claro ejemplo de esta partida el importe de combustible que no se consume al estar el vehículo paralizado, los peajes que no se abonan, la repercusión de la amortización por la compra del vehículo o las reparaciones o revisiones ordinarias".[31]

En ese sentido, nuestro Código Civil requiere que se deduzcan de la partida de lucro cesante aquellos gastos en los que el demandante hubiera incurrido si el demandado hubiese cumplido su obligación, pero que, debido al incumplimiento, no se materializaron. Como veremos, más allá de una clasificación rígida, lo que corresponde es concretar los gastos operacionales no incurridos. Por eso, las clasificaciones que analizaremos a continuación no pretenden ser una camisa de fuerza, más bien sirven para facilitar la labor del tribunal. Por tanto, el cálculo deberá enfocarse en determinar los costos que el demandante

---

[30] Sentencia SAP de Soria, Sección Primera de 13 de septiembre de 2004, citada en Femenía López, *op. cit.,* pág. 203.

[31] *Íd.* Véase, por ejemplo, Sentencia de la SAP de Valencia, Sección Undécima de 16 de mayo de 2007.

realmente se ahorró como consecuencia del incumplimiento del demandado.

Como adelantáramos, el recurrido sugiere que adoptemos la normativa prevaleciente en algunas jurisdicciones de los Estados Unidos que distingue entre los gastos operacionales fijos y aquellos que, en efecto, varían según el volumen de actividad de la empresa. Dicha normativa es cónsona con la doctrina civilista previamente discutida, por lo cual pasamos a mencionarla rápidamente.

La primera distinción que se hace en la doctrina estadounidense es entre los gastos operacionales como lucro emergente o como lucro cesante, pues, en dicha tradición, al igual que en el derecho civil, se compensa tanto por las pérdidas causadas como por las ganancias dejadas de obtener.[32] En el primer supuesto, se trata de aquellos gastos incurridos por una persona como parte del cumplimiento de una obligación contractual. En caso de que la otra parte incumpla con su prestación, el perjudicado puede incluir en su partida de daños todos los gastos operacionales incurridos, independientemente de si eran fijos o, por el contrario, estaban relacionados directamente con la empresa abortada, siempre y cuando

---

[32] 3 A.L.R. 3d 689, 693. "[L]osses caused and the gains prevented … In §329 of Restatement of Contracts, it was said that one measure of damages for a breach of contract is the net amount of the loss caused and gains prevented by the breach, in excess of savings made possible". (Énfasis suplido). Véase, además, J. Ross Pepper, Recovering Lost Profits: Prove. Calculate. Award, 44 Tenn. B. J. 14, 15 (2008). "A plaintiff may not recover lost gross profits, gross revenues or gross sales. Only lost net profits may be recovered".

hayan sido previsibles. Hay unanimidad entre las jurisdicciones de los Estados Unidos en cuanto a que los gastos operacionales son compensables como daño emergente.[33]

Así, en los casos de incumplimiento contractual, si se adquiere algún tipo de equipo o material o se incurre en algún otro gasto con miras al cumplimiento del contrato, el demandante podrá presentar prueba al respecto, y ese tipo de daño será compensado. El problema se da en el segundo supuesto, al calcular las ganancias dejadas de percibir. Se plantea, específicamente, si se deben deducir los gastos operacionales de la partida de lucro cesante que debe pagar el demandado cuando no se ha incurrido en dichos gastos precisamente porque se ha incumplido el contrato. En esos casos, para obtener la cuantía que comprende el ingreso neto, hace falta deducir los gastos operacionales que de haberse cumplido el contrato se hubieran materializado, pero que realmente no fueron incurridos debido al incumplimiento contractual. Si bien hay unanimidad sobre el primer supuesto, la normativa estadounidense se ha dividido, en cuanto a ciertos aspectos, sobre el segundo.[34]

---

[33] *Íd.*, pág. 695.

[34] *Íd.* "If, however, the plaintiff's claim for damages is based on the theory that the defendant has prevented the plaintiff from carrying out certain transactions and has thereby been responsible for causing the plaintiff a loss of profits, there has been a divergence of opinion as to whether or not the plaintiff must deduct the overhead expenses allocable to the unperformed transactions in computing the amount of lost profits recoverable from the defendant". *Íd.*, pág. 692. Algunas jurisdicciones no permiten deducción alguna por concepto de gastos operacionales, como California, Iowa, Luisiana, Oklahoma y Pensilvania, mientras otras sí permiten deducciones por

Para efectos de ese segundo supuesto, la mayoría de las jurisdicciones en los Estados Unidos distinguen entre los gastos operacionales fijos que no fluctúan con el volumen de negocio, y, por tanto, no se ven afectados si se incumple el contrato, y los gastos operacionales variables que oscilan de acuerdo al volumen de negocio realizado. Esta distinción responde a la norma general de que un demandante no puede recuperar las ganancias brutas no percibidas, sino únicamente las ganancias netas frustradas.[35] Por tanto, si el gasto se evitó como consecuencia del incumplimiento, se deducirá de la partida de lucro cesante. Como hemos visto, igual ocurre en el derecho civil.

Las jurisdicciones que distinguen entre gastos operacionales fijos y gastos operacionales variables definen los primeros como aquellos que se incurren independientemente de la productividad de la empresa.[36] De igual forma, definen los segundos como aquellos que fluctúan con el vaivén del volumen de actividad realizada o

gastos operacionales variables, como Minnesota, Nueva York, Carolina del Norte y Virginia. *Íd.*, pág. 697. Véase, además, Ross Pepper, *supra*, pág. 15; H. Kent Munson, <u>Fixed Overhead Expenses: The Gremlins of Lost Profits Damages</u>, 56 J. Mo. Bar 104 (2000).

[35] Ross Pepper, *supra*, pág. 15. Véase, además, <u>Ameristar Jet Charter, Inc. v. Dodson</u>, 155 S.W. 3d 50, 54 (2005, Missouri) "The goal of awarding damages is to compensate a party for a legally recognized loss … A party should be fully compensated for its loss, but not recover a windfall".

[36] Kent, *supra*, pág. 104. "[R]egardless of the volume of output. They do not vary with the volume of business".

están directamente vinculados con dicho volumen.[37] En cuanto a los gastos operacionales variables, los tribunales y comentaristas han tenido que recurrir al uso de ejemplos para poder distinguirlos efectivamente. Gastos por concepto de impuestos, seguros, arrendamiento del local comercial principal y salarios gerenciales normalmente se consideran fijos.[38] En cuanto a gastos considerados como variables, se han mencionado el combustible, el mantenimiento, la depreciación del equipo, los intereses, algunos seguros, los salarios ordinarios, los beneficios laborales y los arrendamientos particulares relacionados con la prestación incumplida.[39]

Pero los tribunales han hecho hincapié en que no se pueden hacer listas universales, pues todo depende del negocio particular. En algunos casos, un gasto será considerado fijo, mientras que en otro puede caracterizarse como variable. El elemento crucial será si en efecto el gasto sólo se hubiera incurrido de haberse cumplido la obligación.[40]

---

[37] *Íd.* "At times, expenses that are generally considered to be overhead may fluctuate as the volume of business increases or decreases. These variable overhead expenses, also referred to as direct or variable expenses, consist of those overhead type of expenses directly linked to, or which fluctuate with, the volume of output". Véase, además, Ameristar v. Dodson, *supra*, pág. 55.

[38] Íd.

[39] *Íd.*, pág. 56.

[40] Ross Pepper, *supra*, pág. 16. Véase, además, Buono Sales, Inc. v. Chrysler Motors Corp., 449 F.2d 715 (3er Cir. 1971). En esa ocasión, el tribunal de circuito federal resolvió que debía deducirse de la partida de lucro cesante el

Lo anterior no supone una dicotomía inflexible entre gastos operacionales fijos y gastos operacionales variables. Hay algunos costos que no se pueden clasificar de manera tajante como fijos o variables debido a su naturaleza. En esa dirección, hay gastos que se denominan como semi-fijos o semi-variables. Estos gastos incluyen una cantidad base fija, que no se verá afectada por las fluctuaciones en el volumen o actividad del negocio, y otra porción que varía de acuerdo al nivel de actividad que se realiza, si ésta se amplía con el tiempo. Estos costos semi-variables o semi-fijos contienen una porción que no debe ser deducida al calcular la ganancia neta, pues, si bien se trata de gastos operacionales que varían con el volumen de negocios, no responden en proporción inmediata a las fluctuaciones en el nivel de actividad. En ese sentido, caen más dentro de la definición de gastos operacionales fijos, pues la característica fundamental de un gasto operacional variable no es el mero hecho de su fluctuación, sino que la misma tenga un vínculo directo y proporcional con el volumen de negocio. Por tanto, esos costos son susceptibles de dividirse en elementos fijos y elementos variables, según sea el caso. Por último, a pesar de que se menciona que en los negocios de servicio casi todos los

---

ingreso que pudo obtener el demandante por el espacio comercial no ocupado por el demandado producto de su incumplimiento de contrato. Es decir, lo que en otras circunstancias podría calificarse como un gasto operacional fijo, se convirtió en una partida deducible porque el demandante obtuvo una ventaja como consecuencia del incumplimiento del demandado, pues el espacio desocupado pudo ser explotado económicamente.

gastos operacionales son fijos, ello no varía la norma de que sólo se pueden deducir de la partida de ganancia perdida los gastos operacionales variables.[41]

Finalmente, los tratadistas y la mayoría de los tribunales estadounidenses también coinciden en que el peso de la prueba para demostrar que un gasto operacional es fijo y no variable <u>recae sobre el demandante que reclama lucro cesante</u>.[42] Lo mismo concluye la doctrina científica española.[43] Es decir, se presumirá que un gasto operacional varía con una merma en la actividad económica del demandante, a menos que éste demuestre lo contrario. En caso de que logre demostrarlo, el gasto operacional se considerará fijo e independiente del volumen de actividad económica del demandante, y no se deducirá de la partida de lucro cesante. Si, por el contrario, el demandante no logra cumplir con el peso de la prueba, el gasto operacional se entenderá variable y procederá una disminución proporcional en la partida de lucro cesante.

Corresponde al Tribunal de Primera Instancia hacer esta determinación con prueba suficiente, de manera que pueda confeccionar un remedio adecuado. No bastará que el demandante presente una tabla que recoja los ingresos dejados de percibir; tiene que pasar prueba sobre sus

---

[41] Ross Pepper, *supra*, pág. 15.

[42] *Íd.*, "The burden of proof is on the plaintiff". Véase, además, <u>Buono v. Chrysler</u>, *supra*, n. 4.

[43] *Véase* Valverde y Valverde, *op.cit.*, pág. 115. Esto responde a la norma general de que la prueba del daño incumbe al acreedor.

gastos operacionales y demostrar su naturaleza fija no variable.[44] De concluirse que todos los gastos operacionales son fijos, no se deducirá cantidad alguna de la partida por lucro cesante. Si no se demuestra la naturaleza fija de los gastos, se entenderá que son variables y podrán ser deducidos.[45] En ese caso, para hacer la deducción correspondiente, el foro primario deberá calcular el aumento en los gastos operacionales variables que se hubiera manifestado si el demandado hubiese cumplido su obligación.

Lo fundamental al hacer esta determinación es identificar los gastos operacionales en los cuales se hubiera incurrido si se hubiese cumplido el contrato, en vez de un simple análisis rígido entre gastos fijos y variables. La distinción entre gastos operacionales fijos y variables tiene como objetivo guiar el trabajo del tribunal, no atarle las manos. Por esa razón, el cálculo debe enfocarse en determinar los costos que el demandante realmente se ahorró por razón del incumplimiento. Al

---

[44] El caso de Ameristar v. Dodson, *supra*, es altamente ilustrador. El Tribunal Supremo de Missouri resolvió que no era suficiente que un funcionario de la empresa demandante presentara una tabla con un estimado de las ganancias frustradas. Dado que el alto foro estatal concluyó que algunos gastos operacionales pueden ser fijos en ciertos contextos pero variables en otros, y que el expediente era insuficiente para determinar qué gastos operacionales correspondían a una u otra clasificación, el Tribunal devolvió el caso al foro de instancia para una vista evidenciaria sobre la cuantía de los daños.

[45] Por su parte, Ross Pepper propone que si el demandante falla en presentar esta prueba, el tribunal podrá presumir que la evidencia no presentada hubiese sido adversa a la reclamación del demandante. Ross Pepper, *supra*, pág. 15.

momento de calcular la cuantía de lucro cesante, el objetivo debe ser determinar aquellos gastos que no se materializaron debido al incumplimiento contractual. Estos son los costos que se deberán reducir de la cuantía de lucro cesante, es decir, que no se le compensarán al demandante.

III

En virtud de lo anterior, resolvemos que, cónsono con la naturaleza reparadora de nuestro ordenamiento civil contractual y extracontractual y el mandato del artículo 1059 de Código Civil, cuando se otorguen daños por concepto de lucro cesante deberán deducirse todos los gastos operacionales en los cuales el demandante hubiera incurrido si el demandado hubiese cumplido su obligación. De esta manera, la partida por lucro cesante reflejará únicamente las ganancias netas que el demandante ha dejado de percibir. Corresponde al demandante presentar prueba al tribunal sobre sus gastos operacionales y demostrar que éstos son de naturaleza fija, es decir, que hubiera incurrido en ellos independientemente del cumplimiento del contrato. De lo contrario, se entenderá que los gastos operacionales son variables y se deducirán de la partida de daños otorgados.

En el caso de autos, el Municipio de Gurabo y ConWaste son solidariamente responsables por los daños causados a Waste Management. El contrato exclusivo firmado por el Municipio y Waste Management aún tenía varios meses de vigencia cuando el primero incumplió su obligación y

ConWaste intervino torticeramente en la relación contractual. Sin duda, el demandante tiene derecho a recuperar, por concepto de lucro cesante al amparo del artículo 1059 del Código Civil, las ganancias netas que haya dejado de percibir. No obstante, en el juicio Waste Management se limitó a producir una tabla con las proyecciones de depósitos de desperdicios utilizando los depósitos anteriores como base. De esa manera, demostró los ingresos brutos que hubiera recibido si el Municipio hubiera cumplido su obligación contractual. En cuanto a las ganancias netas, aunque el señor Renta testificó que, por la naturaleza del negocio, los gastos operacionales de la empresa no fluctuaban de acuerdo al volumen de los desperdicios depositados en el vertedero de Humacao, lo cierto es que también expresó que no se hizo ningún estudio o análisis para verificar si ello era cierto. Es decir, no se demostró que los gastos operacionales fueran fijos. <u>Lo que es más, ni siquiera se presentó prueba alguna sobre los gastos operacionales en general</u>.

Evidentemente, Waste Management desconocía que tenía que demostrar a cuánto ascendían sus gastos operacionales y que éstos eran fijos. Por tanto, el expediente es insuficiente para determinar adecuadamente si, en efecto, hay que hacer alguna deducción a la partida de lucro cesante. Siendo ello así, es necesario que el foro de instancia celebre una vista evidenciaria para determinar, en primer lugar, cuáles son los gastos operacionales del vertedero de Waste Management en Humacao, pues la

presunción de que éstos son variables se activa una vez se determina el monto total de gastos operacionales, cosa que no ha ocurrido en este caso. En segundo lugar, una vez se establezca a cuánto ascienden dichos gastos operacionales, se debe determinar su naturaleza fija o variable, según los criterios explicados en esta Opinión.

Por los fundamentos expuestos anteriormente, se acoge el recurso como un *certiorari* y se expide el auto para modificar la sentencia del Tribunal de Apelaciones y devolver el caso al Tribunal de Primera Instancia para la continuación de los procedimientos según dispuesto en esta Opinión.

Se dictará sentencia de conformidad.


Liana Fiol Matta
Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Coquí Landfill, Inc.,
h/n/c Waste Management de
Puerto Rico
       Recurridos

         v.                  AC-2010-110

Municipio de Gurabo;
Consolidated Waste Services,
Corpág. h/n/c Conwaste

     Municipio de Gurabo
       Peticionario

*SENTENCIA*

En San Juan, Puerto Rico, a 20 de septiembre de 2012.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte integrante de la presente Sentencia, se acoge el recurso como un *certiorari* y se expide el auto para modificar la sentencia del Tribunal de Apelaciones y devolver el caso al Tribunal de Primera Instancia para la continuación de los procedimientos según dispuesto en la Opinión.

Lo acordó y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Rivera García concurre sin opinión.

El Juez Presidente señor Hernández Denton disiente por entender que procede confirmar la apreciación de la prueba realizada por el Tribunal de Primera Instancia. Asimismo, es del criterio que —en este caso— el Tribunal no está en posición de crear judicialmente presunciones evidenciarias que no necesariamente son de aplicación general a todos los negocios de todas las industrias que podrían ser objeto de una reclamación sobre lucro

cesante. Los jueces de primera instancia tienen la discreción de evaluar la presentación de prueba pericial, conforme a las particularidades de cada caso, sin aplicar mecánicamente una fórmula para restar gastos "variables". Lo importante es que se tomen en cuenta aquellos gastos que se incurren necesariamente para generar la ganancia dejada de percibir, independientemente de cómo esos gastos son catalogados en la teoría contable y económica que se le presente al juzgador.

La Juez Asociada señora Rodríguez Rodríguez disiente por entender que la controversia versa sobre un asunto de credibilidad en cuanto al testimonio presentado por Waste Management. Considera que no le corresponde a este Tribunal intervenir con la apreciación de la prueba hecha por el tribunal sentenciador. Asimismo, disiente de la creación de una nueva presunción evidenciaria a favor del demandado una vez el foro de instancia ha determinado que procede el pago de lucro cesante. La mayoría del Tribunal le impone, con la norma establecida, la carga al demandante -que ya ha obtenido un fallo a su favor- de demostrar qué gastos son variables y qué gastos son fijos para determinar la partida correspondiente a lucro cesante. Esta operación bien puede ser hecha por el juzgador a la hora de establecer esta partida sin adentrarnos en fórmulas rígidas que no necesariamente son de aplicación general.

El Juez Asociado señor Martínez Torres no interviene.


                         Aida Ileana Oquendo Graulau
                         Secretaria del Tribunal Supremo